**Estelle MANZI, Plaintiff,**

v.

**Robert DICARLO, Individually and in his official capacity; Clorinda Annarummo, Individually and in her official capacity; and The State of New York and The New York State Senate, Defendants.**

**No. 98–CV–488 ERK.**

United States District Court,
E.D. New York.

April 6, 1999.

Bonnie M. Mussman, New York City, for plaintiff.

Andrea Christensen, Kaye, Scholer, Fierman, Hayes & Handler, New York City, Alpha Sanghri, Office of the Attorney General State of New York, New York City, for defendants.

## MEMORANDUM & ORDER

KORMAN, District Judge.

Plaintiff, Estelle Manzi, worked in the district office of State Senator Robert DiCarlo from November 1993 until February 1995, when she was dismissed at the age of 61. She claims that she was harassed and fired because of her age and because she suffered from arthritis. Manzi was originally hired as a case-specialist by New York State Senator Christopher Mega in November 1992. (Manzi Dep. at 7). She obtained this patronage position through the help of defendant, Robert DiCarlo. (Manzi Dep. at 23 ("Q. How did you obtain a position in Senator Mega's office? A. . . . Robert DiCarlo was nice enough to get me the position.")). At the time, Manzi was 59 years old. (Sloan Aff. ¶ 17 & Exhibit E). Her employment was renewed under Senator Mega's "appointing authority" from January 1, 1993 through December 31, 1994. (*Id.*). In the summer of 1993, however, Senator Mega resigned to become a judge of the New York State Court of Claims. (DiCarlo Aff. ¶ 5). In 1993, DiCarlo was elected to fill Senator Mega's seat.

DiCarlo "inherited" Senator Mega's staff. (DiCarlo Aff. ¶ 7; Sloan Aff. ¶ 18). Defendant Clorinda Annarummo became DiCarlo's Chief of Staff. In this role, Annarummo had hiring and firing authority and participated in DiCarlo's hiring and firing decisions. (Manzi Dep. at 28–29, 118–19, 218–19; DiCarlo Dep. at 30–36). Together with Annarummo, Charisse Renzi, who is not a party to this case, supervised Manzi's work. In December 1993, Manzi became Scheduling Coordinator. (Manzi Dep. at 60–61, 65–66). Her work performance was satisfactory. (*Id.* at 43). In January 1994, Senator DiCarlo was given a staffing allocation and recommended employment of the majority of Senator Mega's staff, including Manzi, from January 27, 1994 to December 31, 1994. Manzi was promoted and given a salary increase under Senator DiCarlo's appointing authority. (DiCarlo Aff. ¶ 9, Sloan Aff. ¶ 18).

### I. Manzi's Alleged Disability

In August of 1992, Manzi had been diagnosed with arthritis at the joints of both thumbs. (Defendants' Exhibit P (Manzi's

medical records)). She did not see her doctor again until early 1994, when she filed a Worker's Compensation Claim, complaining of pain in both thumbs, allegedly aggravated by typing. (Defendants' Exhibits P & O (Manzi's Worker's Compensation)). At that time, upon the advice of her doctor, Manzi began wearing a soft cast on her hand to alleviate the pain from her arthritis. (Manzi Aff. ¶ 4). She was supposed to wear the cast as much as possible, but she had to remove it to type. (*Id.*). Manzi did not see her doctor again until February 27, 1995, five days after her termination, and approximately the same time that she consulted her attorney regarding this lawsuit. (Defendants' Exhibit P; Manzi Dep. at 69).

Despite her arthritis, Manzi was able to perform all of her tasks including typing. (Manzi Dep. at 112). As she alleged in her affidavit filed here, "[w]hile working for State Senator DiCarlo, I was able to perform all of my essential duties," except for an unusual filing project necessitated by the relocation of the Senator's district office. (Annarummo Aff. ¶¶ 11–12; Manzi Dep. at 112, 200–04). The project involved lifting and filing 15,000 to 16,000 files that were "tightly packed" in a cabinet. (Manzi Dep. at 66). The filing project caused Manzi considerable pain because she had "great difficulty grasping and pulling things and the files were tightly wedged." (Manzi Aff. ¶ 5; *see also* Manzi Dep. at 66–67 ("I could not physically do it. I have a problem lifting things. I can't carry things.")). This project, which occurred at the end of 1994, was the first time she had communicated any limitation in her manual dexterity or her ability to work. As she testified at her deposition:

Q. You never discussed with Clorinda Annarummo what jobs you could perform in the office and what jobs you could not perform in the office because of your disability; is that correct?

A. That's correct, because basically I could perform. I could type. I didn't have any problem with anything, except I can't lift things.

(Manzi Dep. at 112). Nor did she provide medical documentation regarding her disability to any of the defendants. (Manzi Dep. at 99, 200).

## II. Age Comments

When DiCarlo first saw Mrs. Manzi wearing her cast, he allegedly referred to her as a "cripple." (Manzi Dep. at 35–41, 61–62; Davis Dep. at 86 ("wow, now I have cripples here as well"); Renzi Dep. I at 100 ("We have all invalids here.")). From time to time, DiCarlo made other comments about various employees "getting on in years" and "being too old for the job," being "over the hill,"and being "old fogeys." He also spoke of the need for "young guns" and "young blood," commented about seniors "thinking we owe them a living" and "having more money than we do," and stated that he did not feel sorry for them. (Manzi Dep. at 35, 38–41, 101–03, 113–18, 209–11, 263; Davis Dep. at 19–20, 79–90 ("young blood"; "they think the world owes them a living"; "seniors have more money than us, don't feel sorry for them"); Renzi Dep. I at 99–103 ("young blood"; "invalid" comment); Renzi Dep. II at 127–29 ("young blood" comment heard "once or twice")). At one point DiCarlo allegedly told Manzi, "I want to fire Faye [Davis] because she is getting on. She doesn't have patience." (Manzi Dep. at 101).

Defendant Annarummo also made derogatory comments about the older employees in the office. She complained about Lucille Griffin walking too slowly and looking old. Griffin was fired shortly thereafter. Annarummo also described Austen Canade as "over the hill," and Eugene Russo as "stale" and "old." (Manzi Dep. at 233–35; Davis Dep. at 21). (Canade and Russo were still employed at the office in 1996. (Defendants' Mem., Addendum 2)). In addition, she made remarks about needing young people with more energy. (Manzi Dep. at 115–18, 233–35;

Davis Dep. at 20–22; Renzi Dep. II. at 63–65).

### III. Other Harassment

Manzi claims that, beginning in 1994, she was subjected to continual harassment and disparate treatment by DiCarlo and Annarummo beyond the alleged age related comments. First, she was denied training as Scheduling Coordinator. (Manzi Dep. at 52–54, 185; Renzi Dep. I at 13–15; *but see* Annarummo Aff. ¶¶ 8–10 (Manzi was given the same one-day computer training as everyone else.)).

Second, her request for a quiet location to work was denied, and she was assigned additional receptionist and phone answering duties, which diverted her from her scheduling responsibilities. Apparently, every prior staff member that served as Scheduling Coordinator since 1986 had sat where Manzi sat and handled additional responsibilities. (Annarummo Aff. ¶ 6). Manzi alleges, however, that Anke Long, her predecessor as Scheduling Coordinator, had been assigned a quiet desk in the back so she could concentrate on her scheduling duties. (Manzi Dep. at 174–76; Plaintiff's Exhibit 1, ¶ 3). Annarummo attributes Long's "brief period of time" at that desk to staffing changes. (Annarummo Aff. ¶ 6).

In November 1994, Manzi was removed as scheduling coordinator (but retained her title and salary, Annarummo Aff. ¶ 7) and was replaced by Andrea Sabatella, who was approximately 24 years old. Sabatella was assigned a quiet desk in the back of the office, and was given training by Annarummo. Manzi became a case-specialist again. (Manzi Dep. at 93, 176; Plaintiff's Exhibit 1, ¶ 4). Also in or about November 1994, Manzi was asked to clean the office cellar, which was full of mice and roaches. She refused because it was not in her job description and it involved lifting heavy cartons "which is not a job for a woman to do." (Manzi Dep. at 109–10).

Shortly thereafter, Annarummo assigned Manzi a filing project which involved lifting and sorting approximately fifteen to sixteen thousand files (the "filing project"). (Manzi Dep. at 108–12). This project caused Manzi considerable pain. (Manzi Dep. at 66–67). Because of her arthritis, she had difficulty grasping and pulling the files, which were wedged tightly in the drawers. (Manzi Aff. ¶ 5). Annarummo was made aware of Manzi's arthritis, the aggravation of that condition by the filing project, and Manzi's complaints of pain when she performed the project. (Manzi Dep. at 66–69, 200–204; Davis Dep. at 86; Renzi Dep. at 100; Annarummo Dep. at 179–80; Plaintiff's Exhibit 5). Although Manzi never spoke directly with Annarummo, she spoke with Renzi, who informed Annarummo of Manzi's pain. Annarummo allegedly responded that Manzi had no choice and had to work on the filing project. (Manzi Dep. at 107–09; Renzi Dep. II at 97–100; Renzi Dep. I at 21–33). She did, however, say that Renzi could ask some of the part-time male staff members to help lift the files. (Annarummo Aff. ¶ 12).

In November 1994, Senator DiCarlo was re-elected to the Senate for the 1995–96 term. (DiCarlo Aff. ¶ 5). In December 1994, DiCarlo recommended continued employment for Manzi for the January 1, to February 22, 1995 period. (Defendants' Exhibit E; Sloan Aff. at ¶ 19). In January 1995, however, Senator Joseph L. Bruno, the new Majority Leader and Temporary President of the Senate, sought to reduce the Senate's expenditures by 10% ($7 million). (Defendant's Exhibit N, Sloan Aff. ¶ 25; DiCarlo Aff. ¶¶ 15, 25). Among the cuts implemented were reductions in staffing allocations. (Sloan Aff. ¶ 29). In January 1995, Senator DiCarlo's staffing allocation was reduced by $82,800 from the previous year. (Sloan Aff. ¶ 30; DiCarlo Aff. ¶ 17).

In January 1995, Annarummo told Renzi that Manzi would be leaving and would be replaced by "two young people." (Renzi Dep. I at 39–41; Renzi Dep. II at 22–24).

That same month, Annarummo stated at a staff meeting that DiCarlo would be finding Manzi another job, and that Manzi would be leaving the office. (Plaintiff's Exhibit 1, ¶ 5). In early February 1995, DiCarlo told Manzi that, because of budgetary reasons, she could either take a cut in salary if she wished to remain on staff, or she could go to another agency. Manzi told DiCarlo and Annarummo that she wanted to stay and would take a pay cut. (Manzi Dep. at 85–86; Plaintiff's Exhibit 1, ¶ 5). Disregarding Manzi's decision, Annarummo shouted at her that she was terminated. (Manzi Dep. at 86; Davis Dep. at 61–63). Manzi's employment ended on February 22, 1995.

Only three members of Senator DiCarlo's staff were not rehired in February 1995: Ms. Manzi, Charisse Renzi (age 28), and Lorie Pizzola (age 27). (DiCarlo Aff.; Defendants' Exhibit V). Renzi claims that she was fired for opposing the discrimination against Manzi. (Renzi Dep. I at 13). During the rest of 1995, the employment of three other individuals was not continued: Shane Brody (age 22), Fortuna Davis (age 65), and Andrea Sabatella (age 25). (Defendants' Exhibit V). Fortuna Davis testified that she resigned from her position to pursue other interests and to spend more time with her husband. (Defendants' Exhibits I & T; Davis Dep. at 68–69). She stated that she was never discriminated against by anyone while working in Senator DiCarlo's office. (Defendants' Exhibit I; Davis Dep. at 130–31). Davis also stated, however, that the "young blood" comments in the office made her uncomfortable, and that "it was a matter of time before [she] would be let go anyway." (Davis Dep. at 18).

By the close of 1996 (when DiCarlo was ousted by a Democrat), there were still more individuals working in Senator DiCarlo's offices over the age of forty than there were under the age of forty. (Addendum 2 to Defendant's Mem. In Support of Summary Judgment). Of these, three were seventy or older, five more were over

sixty, and four more were over fifty. (Id.). While the reason given for Manzi's termination was a reduction in force caused by budget cuts, Manzi alleges that, on February 15, 1995, Anthony Canade, who was then twenty-five years old, was hired as a case-specialist at a salary of $20,000 per year. (Plaintiff's Exhibits 2, 3; Manzi Dep. at 99–100, 216–17). Plaintiff alleges that, notwithstanding her job description as a scheduling coordinator, she was actually performing the duties of a case-specialist at $19,500 per year.

Manzi filed an EEOC complaint on March 15, 1995. (Plaintiff's Exhibit 1). By letter dated April 4, 1995, the EEOC advised Manzi that her case could not be assigned to an investigator for approximately ten months. (Moghadassi Declaration ¶ 3). On May 3, 1995, Manzi requested "a right to sue" letter. After the letter was issued, Manzi filed this action against DiCarlo, Clorinda Annarummo (DiCarlo's former Chief of Staff), the New York Senate, and the State of New York. Her current complaint, which is really an amended version of the complaint filing under a different docket number, includes claims under the Age Discrimination in Employment Act of 1967 (29 U.S.C. §§ 623 et seq.) ("ADEA"), the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201 et seq.) ("ADA"), and analogous claims pursuant to 42 U.S.C. § 1983, and the New York State Human Rights Law, Executive law § 296 ("NYSHRL"). Defendants have moved for summary judgment on a variety of grounds.

## DISCUSSION

### I. Lack of Subject Matter Jurisdiction over New York and the Senate

■ Exhaustion of administrative remedies is a jurisdictional prerequisite to commencing a law suit pursuant to the ADEA or ADA, and, as a general rule, a party who has not been named as a respondent in an EEOC charge may not subsequently be named as a defendant in a civil suit

under the ADEA. *See, e.g., Sharkey v. Lasmo,* 906 F.Supp. 949, 954 (S.D.N.Y. 1995) (ADEA); *Johnson v. Palma,* 931 F.2d 203, 209 (2d Cir.1991) (prerequisite to commencing a Title VII action [which is analogous to actions under ADA and ADEA] against a defendant is the filing with the EEOC or authorized state agency of a complaint naming the defendant). The defendants argue that this court lacks subject matter jurisdiction over the federal claims against the State and Senate, as they were not named in Manzi's EEOC charge.

This claim is without merit. The purpose of naming the defendant in the filing with the EEOC is that "the charge serves to notify the charged party of the alleged violation and also brings the party before the EEOC, making possible effectuation of the Act's primary goal of securing voluntary compliance with its mandates." *Eggleston v. Chicago Journeymen Plumbers' Local Union,* 657 F.2d 890, 905 (7th Cir. 1981). With "this two-fold purpose in mind, courts have recognized several exceptions to the rule that parties not named in the EEOC charge are not subject to suit in a private civil action." *Id.*

■ The present case is clearly one in which the failure to name the New York State Senate or the State of New York does not undermine in any way the two-fold purpose of the rule that the defendants invoke here. The record is undisputed that, while the plaintiff was formally employed by the New York State Senate, she was a political appointee of Senator DiCarlo at whose pleasure she served.[1] Indeed, Senator DiCarlo's status as the proper named party before the EEOC is confirmed by the supplemental affidavit filed by the former Secretary of the New York State Senate, Stephen F. Sloan. Mr. Sloan explained that the Senate would initiate its own "internal investigation ... and/or engage in conciliation proceedings at the EEOC or DHR, [only where the complaint] names the New York State Senate and/or a member of the central Senate staff as defendants." (Sloan Aff. ¶ 3). Senate action would only be taken where a complaint was filed against a Senator *if* it was requested by him. (*Id.* ¶ 4). Similarly, where the complaint is made against a staff member of a Senator, an investigation would only be undertaken if requested by the Senator or the staff member. Because "there was no request by Senator DiCarlo or his Chief of Staff, Clorinda Annarummo, for an internal investigation of the claims made in the EEOC complaint[, t]he activities engaged in by the [New York State Senate] rose only to the level of facilitating the production of documents and records to the EEOC...." (Sloan Aff. ¶ 6).

Simply stated, the New York State Senate delegated to Senator DiCarlo and Ms. Annarummo the power to decide whether the Senate would participate in proceedings before the EEOC. Moreover, the New York State Senate had notice of the EEOC complaint and, consistent with its policy, it did not investigate the complaint or seek to participate in the EEOC proceeding. Under these circumstances, plaintiff could reasonably conclude that, "if voluntary compliance was not obtainable through the EEOC from [Senator DiCarlo and Ms. Annarummo], the addition of [the Senate] to the conciliation effort would have made little if any difference." *Eggleston,* 657 F.2d at 907.

Because the State Senate was aware of the EEOC charge and that the conduct of Senator DiCarlo and his Chief of Staff would be subject to EEOC inquiry, because it affirmatively abdicated its opportunity to participate in conciliation proceedings aimed at voluntary compliance

---

1. Senate members are elected every two years, and are delegated "appointing authority" by the Senate Majority Leader/Temporary President (the Senate's Chief Executive Officer, who administers the Senate budget) to select individuals for employment on their personal staff. All Senate employees are employees at will who serve at the pleasure of their appointing authorities and the Senate. (Sloan Aff. ¶ 8, ¶¶ 14–15.)

with the ADA and ADEA, and because naming it as a defendant would have been a futile gesture, the State Senate is not entitled to a dismissal for failure to formally name it in the EEOC complaint. *See Eggleston,* 657 F.2d at 905–07 ("where an unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance, the charge is sufficient to confer [Title VII] jurisdiction over that party"); *Vital v. Interfaith Medical Ctr.,* 168 F.3d 615, 619 (2d Cir.1999).

Moreover, this case also falls into a second exception to the exclusion requirement. This is the so-called "identity of interest" exception that has been expressly recognized in the Second Circuit. The exception hinges on four factors:

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;

2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;

3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;

4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Johnson,* 931 F.2d at 209–10 (quoting *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3rd Cir.1977)). No single factor of this test is determinative.

 While the first and forth factors arguably favor the defendants, the two most significant factors, which go directly to the policy of allowing a defendant to obtain the benefits of conciliation, tip in favor of the plaintiff. The New York State Senate, as previously noted, conferred on Senator DiCarlo the decision on whether there would be conciliation or participation by the Senate. This could hardly be a clear case of "identity of interest." Moreover, for this reason and because the EEOC granted plaintiff's request for an expedited "right to sue" letter, and took no conciliation action, the Senate was not prejudiced. Under these circumstances, the application of the "identity of interest" exception clearly requires rejection of the New York State Senate's motion to dismiss on the ground that it was not named in the EEOC complaint. *See Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir.1995).

I recognize that, because the "identity of interest" exception is intended to protect parties "not versed in the vagaries of Title VII and its jurisdictional and pleading requirements," *Johnson,* 931 F.2d at 209, district courts in this Circuit have held that, "as a threshold matter," the exception only applies where plaintiff was not represented by counsel at the time of the EEOC · filing. *Harrington v. Hudson Sheraton Corp.,* 2 F.Supp.2d 475, 478 (S.D.N.Y.1998); *Tarr v. Credit Suisse Asset Management, Inc.,* 958 F.Supp. 785, 794 (E.D.N.Y.1997); *Sharkey v. Lasmo (Aul Ltd.),* 906 F.Supp. 949, 954 (S.D.N.Y. 1995); *see also Alfano v. Costello,* 940 F.Supp. 459, 465 n. 2 (N.D.N.Y.1996) (identity of interest exception "provides leniency to individuals filing EEOC complaints pro se"). In this case, Manzi was represented by counsel when she filed the EEOC charge. (Manzi Dep. at 243). In fact, she was represented by the same counsel when she filed her Worker's Compensation claim, in which she did name the Senate as her employer. (Defendants' Exhibit Q).

This "threshold matter," however, has not been articulated in any opinion of the Court of Appeals, and it would seem to be relevant—at most—to the first and forth

factors rather than a decisive consideration in itself. The complexities of the law are such that a lawyer who has little or no experience in this area, is no more competent to deal "with the vagaries of Title VII and its jurisdictional . . . requirements" than a layman. *Tarr,* 958 F.Supp. at 794; *see Harrington,* 2 F.Supp.2d at 478 (where error in EEOC filing made by "retained counsel whose practice is limited to labor and employment law"). Where, as here, there is a clear "identity of interest" between the individuals named in the EEOC complaint and the Senate, and where the Senate suffered no prejudice from the failure of plaintiff to undertake the futile gesture of naming it in the EEOC complaint, a dismissal of this civil rights action is unwarranted.

## II. The ADEA Claim

Manzi's ADEA claim is close, but genuine issues of material fact bar dismissal. The ADEA, 29 U.S.C. § 623 et seq., makes it unlawful for an employer to fail or refuse to hire, discharge, or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's age. The Second Circuit analyzes ADEA and Title VII claims under the same burden-shifting framework. *See Fisher v. Vassar College,* 114 F.3d at 1335–37. The defendants concede for purposes of this motion that Manzi can establish her prima facie case. (Defendants' Mem. at 19). The defendants have offered a non-discriminatory explanation, budget cuts, for Manzi's termination. The burden now returns to Manzi to demonstrate that the proffered explanation is a pretext, and that she "was likely injured by the defendant's illegal discrimination." *Fisher,* 114 F.3d at 1346.

The defendants point out that, of the three people who were not rehired in February 1995, only the plaintiff was over the age of 40. The other two were 28 years old (Charisse Renzi) and Lorie Pizzola (age 27). (DiCarlo Aff. ¶¶ 19, 20; Defen-

dants' Exhibits E & R). During the remainder of 1995, Faye Davis (age 65) was the only member of the protected class whose employment was not continued. (The others were Shane Brody, age 22, and Andrea Sabatella, age 25.) Ms. Davis stated that she resigned from her position to pursue other interests and spend more time with her husband. (Davis Dep. at 68–69). She also stated that she was never discriminated against by anyone while working in Senator DiCarlo's office. (*Id.* at 130–31).

In fact, Manzi herself was a member of the protected age group when she was hired. Although she was originally hired by Chris Mega, at the age of 59, it was DiCarlo who got her that position. (DiCarlo Aff. ¶ 4; Manzi Dep. at 23 ("Q. How did you obtain a position in Senator Mega's office? A. . . . Robert DiCarlo was nice enough to get me the position.") She was 60 years old when DiCarlo promoted her and gave her a salary raise. (Sloan Aff. ¶ 18; Defendants' Exhibits E & R). She was 61 years old in December 1994, when DiCarlo recommended her continued employment for the January 1, 1995 to February 22, 1995 period. (*Id.*).

The Second Circuit has noted that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring." *Grady v. Affiliated Central, Inc.,* 130 F.3d 553, 560 (2d Cir.1997). *Accord Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996) (recognizing this inference); *Buhrmaster v. Overnite Trasp. Co.,* 61 F.3d 461, 463 (6th Cir.1995); *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1147 (7th Cir. 1994) (plaintiff hired at age 47 and fired by the same person two years later failed to establish a claim for age discrimination); *Lowe v. J.B. Hunt Transp., Inc.,* 963 F.2d 173, 175 (8th Cir.1992) ("it is simply incredible, in light of the weakness of plain-

tiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later"); *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991); *Brennan v. Bausch & Lomb,* 950 F.Supp. 545, 551–52 (E.D.N.Y.1997) (applying same actor inference and dismissing ADEA claims where plaintiff was member of protected class at time of hiring, rehiring, and firing over less than 3–year period); *Ali v. Tribune Entertainment Co.,* No. 93 Civ. 1398, 1996 WL 384913, at *8 (S.D.N.Y. 1996) (weighting same actor inference as factor in mixed-motive case, and granting summary judgment); *Alexander v. Burke Rehab. Ctr.,* No. 92 Civ. 6574, 1995 WL 293963, at *9 (S.D.N.Y.1995). This inference has generally been applied only where it bolstered the employer's legitimate reason for the adverse action. *See Padilla v. Buffalo State College Foundation, Inc.,* 958 F.Supp. 124, 127–28 (W.D.N.Y.1997) and cases cited therein; *Tanzini v. Marine Midland Bank,* 978 F.Supp. 70, 76–77 (N.D.N.Y.1997).

Against these arguments, Manzi's strongest support for her claim are the comments by DiCarlo and Manzi, combined with the hiring of Anthony Canade at the same time she was terminated. Manzi alleges that DiCarlo allegedly told her, "I want to fire Faye [Davis] because she is getting on. She doesn't have patience." (Manzi Dep. at 101). Annarummo allegedly complained about Lucille Griffin walking too slowly and looking old. Griffin was fired shortly thereafter. (Manzi Dep. at 233–35). Annarummo also described Austen Canade as "over the hill," and Eugene Russo as "stale" and "old." (Manzi Dep. at 233–35; Davis Dep. at 21). (Canade and Russo were still employed at the office in 1996. (Defendants' Mem., Addendum 2)). Moreover, Renzi claims to have been fired for opposing the alleged discrimination against Manzi,

(Renzi Dep. I at 13), and Davis stated that the "young blood" comments in the office made her uncomfortable, and that "it was a matter of time before [she] would be let go anyway." (Davis Dep. at 18).

While comments of this kind attributed to the defendants DiCarlo and Annarummo may not alone be sufficient to get a discrimination case to a jury, where "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998). The "other indicia of discrimination" that tips the balance here in favor of a jury resolution of the ADEA claim is evidence of the hiring of Anthony Canade on February 15, 1995 as a case-specialist, at a salary of $20,000 per year. (Mussman Aff. Ex. 2, 3). Plaintiff alleges that, notwithstanding her job description as a scheduling coordinator, she was actually performing the duties of a case-specialist at the identical salary. Since the hiring of Mr. Canade coincided with the firing of plaintiff, plaintiff contends that her replacement by a younger person supports her claim that the "reduction in force explanation" for her termination was pretextual.

Other than arguing over whether plaintiff has introduced sufficient evidence to show that Mr. Canade had taken "over some of her duties," (March 6, 1999 Tr. at 34), this argument has not been sufficiently addressed by the defendants. Indeed, even if Mr. Canade did not assume all of plaintiff's responsibilities, his addition to the payroll at the same time plaintiff was terminated for budgetary reasons, is sufficient to create an issue of fact as to whether the reason advanced for plaintiff's discharge was pretextual and whether age was a substantial motivating factor in plaintiff's dismissal.[2]

---

**2.** The Second Circuit has resolved in plaintiff's favor the issue whether the Eleventh Amendment precludes an ADEA cause of action against New York State. *Cooper v. New*

*York State Office of Mental Health,* 162 F.3d 770 (2d Cir.1998). The Supreme Court has recently agreed to resolve the existing conflict among the Circuits on this issue. *Kimel v.*

While I have assumed for present purposes that plaintiff is an employee who enjoys the protection afforded by the ADEA, the issue is far from clear. The ADEA excludes from the definition of protected employees the "personal staff" of any person "elected to public office in any State or any political subdivision of any State." 29 U.S.C. § 630(f). Plaintiff was described by her attorney as one of the "core of people that actually worked within the Senator's office and that was Manzi, Renzi [and] Davis." (March 6, 1998 Tr. at 14). Senator DiCarlo was her appointing authority and she served at his pleasure. While she was technically an employee of the Senate and her appointment by Senator DiCarlo was subject to ratification by the Senate Majority Leader, (Sloan Aff. ¶ 8), it is arguable whether this formal mechanism alters the nature of the relationship between a Senator and his personal staff. Indeed, I overlooked this formality in concluding that the State Senate did not have to be named on the EEOC complaint. Nevertheless, because this ground was not asserted as a basis for summary judgment, and because "the highly factual nature of the inquiry necessary to the determination of the 'personal staff' exception does not lend itself well to disposition by summary judgment," *Teneyuca v. Bexar County*, 767 F.2d 148, 152 (5th Cir. 1985), I merely note this issue without deciding it.

### III. The ADA Claim

Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA is a close cousin of both the Rehabilitation Act of 1973, 29 U.S.C. §§ 790–794a

(1996), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1996). *See Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir.1995) ("[T]he employment provisions of the ... Act [ADA] merely generalize to the economy as a whole the duties, including that of reasonable accommodation, that the regulations under the Rehabilitation Act imposed on federal agencies and federal contractors."); *Mohamed v. Marriott Internat'l, Inc.*, 905 F.Supp. 141, 154 (S.D.N.Y.1995) ("The new legislation [ADA] is also, however, based closely on Title VII[:] The employment title of the ADA adopts the powers, procedure, and remedies of parts of Title VII[;][m]uch of the wording of the two statutes is the same[;][and][c]ourts in interpreting this provision have been quick to apply precedent set under Title VII.") (internal quotations and citations omitted). Thus, Rehabilitation Act and Title VII precedent is also controlling with respect to ADA claims.

To establish a prima facie case of disability under the ADA, a plaintiff has the burden of proving that she is a "qualified individual with a disability," *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir.1996) (ADA and Rehabilitation Act case), that she has suffered an adverse employment action, and that a causal connection exist between the adverse employment action and the disability. *See id.* at 383; *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994) (Rehabilitation Act case).

In order to establish the first element of her prima facie case—i.e., that she is a "qualified individual with a disability"— Manzi must show that her arthritis constituted a "disability," which the ADA defines as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B)

State Bd. of Regents, 139 F.3d 1426 (11th Cir.1998), cert. granted, Kimel v. Florida Bd. of Regents, —— U.S. ——, 119 S.Ct. 901, 142

L.Ed.2d 901 (1999) and United States v. Florida Bd. of Regents, —— U.S. ——, 119 S.Ct. 902, —— L.Ed.2d —— (1999).

a record of such impairment; or (C) being *regarded as* having such an impairment." 42 U.S.C. § 12102(2) (1996) (emphasis added). By extending the ADA's protections to the last category of employees—i.e., those with "perceived" disabilities—Congress "intended to combat the effects of 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995); *accord School Board of Nassau Co. v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (observing in a Rehabilitation Act case that, "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment").

■ In this case, Manzi does not allege that her arthritis substantially limits her major life activity of working or performing manual tasks.[3] In fact, Manzi testified to the contrary: "[B]asically I could perform. I could type. I didn't have any problem with anything, except I can't lift things." (Defendants' Exhibit P; Manzi Dep. at 112). Even after her termination by DiCarlo, Manzi was subsequently able to work for John Gangemi (DiCarlo's successful opponent in the 1996 primary), as a supervisor, six to seven days a week, from May to October, 1996. (Defendants' Exhibit F; Manzi Dep. at 75; DiCarlo Aff. ¶ 5). A condition which only prevents a claimant from working one particular job or in one particular location is not a disability under the Act. *Heilweil*, 32 F.3d at 723 ("An impairment which disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one."); *Daley v. Koch*, 892 F.2d 212, 214–16 (2d Cir.1989); *Aquinas v. Federal Express Corp.*, 940 F.Supp. 73, 78 (S.D.N.Y. 1996) (employee diagnosed with condition in left shoulder that caused her to have

trouble lifting packages at work was not disabled under the ADA because there was no evidence that there was a restriction on employment generally); *Hazeldine v. Beverage Media, Ltd.*, 954 F.Supp. 697, 703–04 (S.D.N.Y.1997) (inability to shovel snow, engage in strenuous physical exercise, lift and carry more than ten pounds, kneel, or bend does not constitute a substantial limitation on a major life activity).

The analysis does not change if the disability plaintiff claims relates to her ability to perform manual tasks rather than her ability to work. As Judge Goetell recently summarized the applicable law:

[C]ourts have held that plaintiffs must show they are substantially limited in performing a broad range of manual tasks, rather than demonstrating that they are limited in performing one job-related task. *See Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (finding that a plaintiff was not substantially limited in any major life activity other than working because she could engage in the normal activities of daily living such as feeding herself, driving a car, carrying groceries, washing dishes, vacuuming, and picking up trash); *Khan v. Cook County*, No. 96 Civ. 1113, 1997 WL 370199, at **5–7 (N.D.Ill. June 27, 1997) (finding that a plaintiff, who could not lift more than fifteen pounds, write for more than fifteen to twenty minutes without pain, tie his shoes, carry groceries, or take out the garbage, was not substantially limited in performing manual tasks); *Ouzts v. USAir, Inc.*, Civ. No. 94–625, 1996 WL 578514, at *13 (W.D.Pa. July 26, 1996) (holding that a plaintiff was not substantially limited in performing manual tasks even though she could not carry items weighing only a few pounds or do any tasks, such as opening doors, dusting, vacuuming, or stirring with a spoon, because the plaintiff had testified

---

**3.** "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,

breathing, learning, and working." 29 C.F.R. § 1630.2(I) (West 1997).

she could prepare her own meals, bathe, grocery shop, drive, clean, do laundry, and take out the trash), aff'd, 118 F.3d 1577 (3d Cir.1997).

*Zarzycki v. United Technologies Corp.*, 30 F.Supp.2d 283, 288–89 (D.Conn.1998).

Plaintiff did not offer any medical evidence that her arthritic condition affected her ability to perform a broad range of manual tasks. The two reports from her treating physician, one of which is contemporaneous (a few days after she was fired) and one of which was prepared two years later, describe plaintiff's condition with the extensive use of medical jargon. (*See* Dr. Baum's Medical Report, Mussman Aff. Ex. 7 ("On examination the patient has tenderness over the carpometacarpal joints of both thumbs.... There is prominence here, and there is crepitation on motions of these joints.")). Dr. Baum's contemporaneous notes only speak to her ability to perform manual tasks in its concluding paragraph which suggests that plaintiff "had a permanent disability since her job requires considerable typing." (*Id.*). Indeed, Dr. Baum's later report (a narrative letter) indicates that plaintiff's symptoms, which presumably worsened in the two years since she was fired, "will wax and wane over time" and that "at times [she] will be relatively asymptomatic and at other times in severe pain." (Dr. Baum's February 14, 1997 Letter at 2–3, Mussman Aff. Ex. 7). Like his earlier note, Dr. Baum concludes by stating that plaintiff "is permanently disabled, since her job requires significant typing activity." (*Id.* at 3.). The letter is unclear as to which job he is referring.

Plaintiff testified at her deposition, however, that with the exception of the filing project, she "basically ... could perform" her job, that she "could type" and that she didn't have any problem with anything, except she "can't lift things." (Manzi Dep. at 112). She also submitted an affidavit here that says "[w]hile working for State Senator DiCarlo I was able to perform my essential duties, including typing." (Manzi

Dep. ¶ 4). Moreover, at the oral argument on the motion for summary judgment, plaintiff's counsel conceded that plaintiff was "able to perform other jobs [she had with Senator DiCarlo] with a reasonable accommodation of not assigning her things like the filing project. She is able to perform the basic function, the essential functions of her job." (March 6, 1998 Tr. at 53).

These admissions, made personally and by her attorney, are sufficient to override whatever benefit plaintiff would have otherwise derived from the medical assessments she has submitted, and they do not provide a basis for a jury to find that plaintiff was terminated because she *could* not work or because she was limited in performing a broad range of manual tasks. On the contrary, at the oral argument on the motion for summary judgment, plaintiff's counsel stated that the cause of action relating to her firing "would be based on the fact that they [the defendants] *perceived* her has [sic] having a disability." (March 6, 1998 tr. at 54) (emphasis added).

■■ Simply stated, although Manzi is concededly not disabled under the ADA, she argues that she was "regarded as having such an impairment." 42 U.S.C. § 12102(C)(2); 29 C.F.R. § 1630.2. Under the ADA, whether an employee has such a "perceived disability" is determined in two stages. First, the court must determine if she is perceived to have a physical *impairment*. Second, if so, the court must determine whether the impairment is perceived to substantially limit one or more of that person's major life activities. *Greenberg v. New York State*, 919 F.Supp. 637, 641–42 (E.D.N.Y.1996); *accord Wernick*, 91 F.3d 379, 383 (2d Cir.1996) (applying two-stage test to both ADA and Rehabilitation Act claims); *Klem v. Popular Ford Sales, Inc.*, 975 F.Supp. 196, 200 (E.D.N.Y.1997). "The mere knowledge of symptoms alone is not sufficient proof [to survive summary judgment] that an employer regarded an employee as disabled." *Id.* at 201 (citation

omitted). Here, there is no evidence that DiCarlo or Annarummo regarded Manzi's arthritis as substantially limiting her ability to "perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3).

At best, Manzi claims that "[o]thers confirmed that, on more than one occasion, DiCarlo and Annarummo referred to older staff members as 'cripples' and 'invalids' ...." (Manzi Mem. at 18). In fact, the cited portions of the deposition transcripts refer only to the single invalid/cripple comment by DiCarlo when he first saw Manzi's cast. There is no reference to any such comments by Annarummo. Moreover, Manzi first started wearing her cast in early 1994. At the end of 1994, however, DiCarlo still recommended that she continue employment into early 1995. Under these circumstances, DiCarlo's comment, while unfortunate, cannot be reasonably construed to reflect a perception on his or Annarummo's part that Manzi's arthritis substantially limited her ability to work or to perform a broad range of manual tasks.

Plaintiff did file a claim for Workers' Compensation in 1994, of which notice was sent to Senator DiCarlo's district office, and Clarise Renzi, plaintiff's immediate supervisor, was aware of it and provided a statement to the State Insurance Fund on May 19, 1994. (*See* Mussman Aff. Ex. 5). The statement did not suggest that plaintiff could not work or type, although it did indicate "she has complained of arthritis symptoms several times" and on one occasion (January 28, 1994) said that "she had pain in her hands and joints." (*Id.*). As of February 7, 1995, the only decision made by the State Insurance and communicated to Senator DiCarlo was an inconclusive finding that the "[c]ase is continued." (*Id.*). There is simply nothing in the Workers' Compensation papers that supports the claim that the defendants were aware of, or perceived that, plaintiff was suffering from a physical impairment that substantially limited one or more of her life activities, and that this was a motivating factor in their decision to fire plaintiff.

■ While the foregoing discussion suggests that plaintiff cannot prevail on her ADA cause of action, that cause of action arises out of a common nucleus of fact as the ADEA cause of action that must be tried; it also involves the resolution of the common issue of why plaintiff was fired. Under these circumstances, the more prudential course of action is to defer ruling on the ADA claim until after trial. If one of a number of integrally related causes of action have to be tried, it makes no sense to grant summary judgment as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that summary judgment was improperly granted. As observed by Judge Clark in an analogous context:

> [T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue.

*Audi Vision Inc. v. RCA Mfg. Co.*, 136 F.2d 621, 625 (2d Cir.1943). Accordingly, defendant's motion for summary judgment is denied without prejudice.

## IV. Retaliation Claims

### A. The ADA and ADEA Claims

The ADA's retaliation proscription, 42 U.S.C. § 12203 (1996), is nearly identical to the one found in Title VII, 42 U.S.C. § 2000e-3 (1996). The ADA proscription states that: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

The ADEA contains an identical provision. *See* 29 U.S.C. § 623(c).

Thus, a prima facie case of retaliation pursuant to the ADA and the ADEA is established by showing that: (1) plaintiff engaged in a protected activity; (2) plaintiff's former employer took employment action that was adverse to plaintiff; and (3) a causal connection exists between the protected activity and the adverse action. *United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir.1996) (Title VII case). If an employee succeeds in establishing his or her prima facie case, the burden of production then shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse action. *See Id.* If the employer meets its burden of production, the employee then bears the burden of establishing that the proffered reason for the action is a pretext for discrimination, "either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir.1997) (en banc). The word "discrimination" is used to articulate a retaliation claimant's burden of proof because the language of 42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate" against an employee "because" she engaged in a protected activity. *Id.; see New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir.1996).

■ Plaintiff alleges that the defendants violated the ADEA and the ADA by retaliating against her for protesting discriminatory acts. She alleges a similar claim of retaliation under the NYSHRL. These claims arise out of action taken by Senator DiCarlo in June, 1995 with respect to Austin Canade and Yolanda Cavalieri. These two employees had both taken early retirement effective April 20, 1995, "which was the last date for early retirement under early retirement incentive legislation." (Sloan Aff. ¶ 35 (filed in 95 Civ. 3583)). Nevertheless, they could continue to work

at a capped salary, and they continued to do so. On June 13, 1995, Senator DiCarlo requested an increase in his budget. His stated reason for requesting the increase was "so that I can retain my present level of staffing, since I have been advised it is not likely that Yolanda Cavalieri and Austen Canade would be receiving further paychecks." (Sloan Aff. (filed in 95 Civ. 3583) Ex. H). Senator DiCarlo concluded his request by noting that "it is essential to me that both be retained." (*Id.*).

In July 1996, the additional funding was granted and the two employees (Ms. Cavalieri, who was 67, and Mr. Canade, who was 61)[4] were rehired retroactive to April 24, 1996. The combined annual salary for the two employees was 21,200, slightly more than plaintiff earned. Plaintiff claims that she was not rehired (although she never asked to be) because she filed a complaint before the EEOC.

The plaintiff here has failed to show a causal connection between the filing of her EEOC complaint and the failure of the plaintiff to sua sponte rehire her. This is not a case in which employees laid off in a reduction of force were recalled en masse. Instead, Senator DiCarlo was able to keep on his staff two elderly employees. Although the two employees were technically "rehired," they never left, and Senator DiCarlo was able to obtain enough money to keep them on. Indeed, because they were both in their sixties, it is unclear why the plaintiff would want to press this tenuous cause of action based on conduct that would seem to undermine her more viable age discrimination claim.

### B. The First Amendment Claim

■ Plaintiff also claims that she was not rehired, because she made "statements to various members of the press regarding her charge of discrimination against defendants [that were] published in newspapers and aired on the radio." (Pl.Amend. Compl.¶ 42). The statements were made a

---

4. The date of birth of the two employees are listed in Exhibit 3 of the Mussuman Affidavit.

day after she filed her EEOC complaint.[5] I agree with the defendants that this claim fails because plaintiff's complaints were personal in nature and generally related to her own situation. *See Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). While the result could arguably be otherwise under the analysis in Judge Newman's concurring opinion in *Saulpaugh,* that analysis (as he recognized) is not consistent with prevailing Second Circuit law.

### V. The Section 1983 Claims

 Because the State of New York is the only proper defendant in the ADEA and ADA causes of action, and because the defendants pressed a possibly viable motion to dismiss for failure of plaintiff to exhaust her administrative remedies, plaintiff has defensively pleaded causes of action under 42 U.S.C. § 1983 against DiCarlo and Annarummo. Plaintiff alleges that these defendants violated the Equal Protection Clause by discriminating against her because of age and disability. The Equal Protection Clause only requires a rational basis for discrimination based on age and disability, *see Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (Age); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (Disability); *see also Kilcullen,* 33 F.Supp.2d 133, 140 (N.D.N.Y.1999), and would arguably not be violated by an employer who declined to undergo the burden and expense of accommodating an employee's disability. *See Welsh v. City of Tulsa,* 977 F.2d 1415, 1420 (10th Cir.1992) (holding that "an employer does not act irrationally by choosing an applicant who does not need any special accommodation over one who does"); *Kilcullen,* 33 F.Supp.2d at 145.

 Nevertheless, it is unnecessary to explore these issues at any length. Nor is

it necessary at this point to resolve the issue whether ADEA actions are permitted under § 1983. *See Zombro v. Baltimore City Police Dept.,* 868 F.2d 1364, 1369 (4th Cir.1989), *cert. denied,* 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989); *Lafleur v. Texas Dept. of Health,* 126 F.3d 758, 760 (5th Cir.1997); *Ray v. Nimmo,* 704 F.2d 1480, 1485 (11th Cir.1983). Plaintiff's § 1983 cause of action based on age and disability discrimination, which must be tried in any event, parallels her claims pursuant to the NYSHRL. Under these circumstances, for reasons similar to those warranting the denial of the motion to dismiss the ADA cause of action, the motion for summary judgment as to these claims is also denied without prejudice.

### CONCLUSION

In summary, for the foregoing reasons, the motion for summary judgment is granted with respect to plaintiff's sixth, seventh and eighth causes of action. The motion for summary judgment with respect to the first, second, fourth and fifth causes of action is denied. The motion to dismiss the third cause of action is premised on the assumption that defendant is entitled to summary judgment on all of the federal causes of action. Because plaintiff's cause of action under the ADEA is sufficient to survive a motion for summary judgment, I retain pendent jurisdiction over plaintiff's third cause of action which alleges age and disability discrimination under the NYSHRL, Executive Law § 296.

**SO ORDERED.**

---

5. The articles published as a consequence of plaintiff's statement are appended as Ex. Q to

the Sanghvi Affidavit filed in 95 Civ. 3583.