Jacqueline BLAND, Plaintiff,

v.

The State of NEW YORK; New York State Unified Court System, Office of Court Administration; and Judge James H. Shaw, Jr., Defendants.

No. 00–CV–6522(ERJ/CLP).

United States District Court, E.D. New York.

March 7, 2003.

Herbert Eisenberg, William J. Stampur, Daniel L. Alterman, New York City, for Plaintiff.

Carolyn Cairns Olson, Attorney General of the State of New York, Michael Colodner, John P. Eiseman, Richard D. Emery, Emery, Celli, Brinckerhoff & Abady LLP, New York City, Douglas M. Soffey, Garden City, NY, for Defendants.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

This case stems from allegations of sexual and racial harassment against a now-retired Justice of the New York Supreme Court, James H. Shaw, Jr. ("Shaw"), by his former secretary, Jacqueline Bland ("Bland" or "plaintiff"). Prior to discovery, defendants New York State ("NYS" or the "State"), New York State Unified Court System, Office of Court Administration ("OCA") and Shaw move to dismiss the complaint under Fed R. Civ. P. 12(b). Plaintiff cross-moves for summary judg-ment under Fed. R.Civ. P. 56(a) claiming that the findings of the State Commission on Judicial Conduct regarding Justice Shaw's conduct towards Ms. Bland require judgment in her favor under principles of issue preclusion.

Plaintiff frames her allegations here as eleven causes of action. In addition to claiming employment discrimination under 42 U.S.C. § 2000e *et seq.* ("Title VII") based on racial and sexual harassment, and alleging that she was fired in retaliation for her complaints (First through Third Causes of Action), she makes the same claims under 42 U.S.C. § 1983 (Fourth Cause of Action), the New York State Human Rights Law (Sixth through Eighth Causes of Action), and the New York City Human Rights Law (Ninth through Eleventh Causes of Action). She also makes a claim under 42 U.S.C. § 1981 for racial discrimination unconstitutionally impairing her contractual rights relating to her employment (Fifth Cause of Action).

## Background

### The Complaint

Plaintiff is an adult African–American female. Complaint ¶ 17. She began working as a secretary to Justice Shaw in August 1985, performing general secretarial duties for him; she stopped working with him when she took medical leave on November 21, 1997. *Id.* ¶¶ 18–19, 23. Plaintiff alleges that she was fired in or about May 1998 after she complained about Shaw's sexually harassing conduct. *Id.* She was later reinstated by OCA. *Id.* ¶ 20. She alleges she was paid salary and benefits by OCA and subject to its policies regarding the terms and conditions of her employment; the State and OCA have otherwise delegated to defendant Shaw policy-making authority relating to employment in his court. *Id.* ¶¶ 21–22.

The complaint alleges that shortly after Ms. Bland went to work as Justice Shaw's secretary he began to physically touch her in an uninvited, unprofessional and inappropriate manner. His conduct included but was not limited to pulling her onto his lap, holding her hand, massaging her shoulders, cupping the side of her breast, intertwining his pinky finger in hers, and sitting uncomfortably close to her rather than on his own side of his desk. Defendant Shaw continued engaging in such inappropriate behavior throughout Ms. Bland's employment. *Id.* ¶¶ 24–26. Plaintiff claims to have objected to this conduct, and to have repeatedly told him that it was unprofessional and unacceptable. Plaintiff claims not to have condoned this conduct in any manner. *Id.*

Plaintiff also makes claims about verbal harassment, including comments that plaintiff's breasts or "tits" were "voluptuous"; that her husband "never gets thirsty"; that she was losing her "titties and ass" when she had begun to lose weight; that an "old man [the judge] needed a little excitement in his life"; that he did not like it when she wore loose clothing to the office; that her hips were "wide and sexy"; that she should be having sex, and that she should be having sex with him; and that her lips were "sexy," "big," "wide" and "voluptuous." Plaintiff alleges that Justice Shaw also told her about men's pleasure at sucking on breasts, and exhibited gestures depicting such acts, as well as indicating the size of her breasts with his hands. *Id.* ¶¶ 27–28, 42, 48. Plaintiff also alleges that Justice Shaw's requirement that she use the bathroom in chambers threatened her sense of safety and increased her anxiety. *Id.* ¶¶ 29–30. Plaintiff further claims that Justice Shaw described affairs he had while married, asked intimate questions, routinely tried to kiss her, pulling her tightly toward him. At least on one occasion he kissed her and put his tongue into her mouth. He is alleged to have asked her to "give an old man a hug" and to have asked her to have sex with him. *Id.* ¶¶ 41–44. He is also alleged to have described medical procedures he underwent in an obscene way and referred to plaintiff's "big pink nipples." *Id.* ¶¶ 55, 56. Plaintiff alleges she felt disrespected and degraded and became depressed, anxious, emotionally distraught and suffered from migraine headaches. *Id.* ¶ 51.

Justice Shaw is also claimed to have said a number of disparaging things to her about dark-skinned African–American women, stating that he preferred women who were lighter-complected, such as Ms. Bland. ¶¶ 33–35. Shaw repeatedly asserted to plaintiff that he had the power to fire her, threatening her with the loss of her job if she did not acquiesce or if she complained. Ms. Bland was "afraid to complain to supervisors at OCA" about this conduct because she was afraid she would be fired, and afraid no one would believe her. *Id.* ¶¶ 52–53.

On or about November 10, 1997, plaintiff alleges that she told Justice Shaw that he was "nasty" and a "chauvinist." On November 12, 1997, Shaw called plaintiff into his office and told her that he would never talk to her again on a personal level because of the possibility of being charged with sexual harassment. When plaintiff agreed, Shaw became angry. *Id.* ¶¶ 57–58.

On November 14, 1997, plaintiff complained about Shaw's conduct to the OCA EEO officer at Brooklyn Supreme Court. On November 18, 1997, Shaw began to reprimand plaintiff for her unprofessional attitude. Plaintiff allegedly told Shaw that his sexual comments and touching had made her feel uncomfortable. *Id.* ¶ 62.

Plaintiff filed a charge of discrimination against Shaw with the OCA's EEOC office.

She also made complaints to the New York City Commission on Human Rights (a complaint eventually transferred to the EEOC), as well as to the Chief Judge of the State Court of Appeals, the Office of the Chief Administrative Judge of the State of New York, the Inspector General's Office and the Board of Judicial Ethics Commission. *Id.* ¶ 63.

In April of 1998, plaintiff's counsel sent a letter to Justice Shaw, referencing the EEOC complaint, requesting that he contact counsel. The letter refers to Ms. Bland as Shaw's "former secretary." Affidavit of Jacqueline Bland dated June 26, 2001,("Pl.Aff.") Ex. C. By letter dated May 28, Shaw responded that in light of the accusations against him and the reference to Ms. Bland as his "former secretary" he was terminating her employment. The letter goes on to state "the nature of the charges makes working together impossible."

Plaintiff had actually been out on medical leave since November of 1997. OCA, which at the time of plaintiff's first complaint had assigned investigators to look into the matter from their EEO office, had offered plaintiff alternative employment at the same or higher salary in a different position in the court system. Plaintiff did not accept this offer, and instead remained out of work on medical leave. When Shaw terminated plaintiff in May of 1998, OCA did not remove plaintiff from the State payroll, and again offered her alternative employment. Affidavit of Chief Administrative Judge Jonathan Lippman of the Unified Court System of the State of New York, dated October 31, 2001, ("Lippman Aff.") ¶¶ 23–25.

On September 3, 1998, plaintiff herself filed a charge of discrimination with the EEOC. The EEOC complaint named the New York State Unified Court System and Shaw as defendants. Pl.Ex. G. The EEOC issued a determination on November 23, 1999 finding reasonable cause to believe that plaintiff had been sexually harassed and retaliated against. Pl.Ex. J. Plaintiff received her right to sue letter on August 18, 2000. Ex. O. The filing date of the complaint in this matter is November 1, 2000.

While the foregoing proceedings were taking place, the New York State Commission on Judicial Conduct took disciplinary action against Justice Shaw. ¶ 65. Both Ms. Bland and another complaining witness, Caroline Rucker, appeared at a hearing before the Commission in July 1999. Although the Commission concluded, after three days of testimony, that the remarks made by Shaw were "inappropriate and demeaning" and merited "severe sanction" it censured him, rather than removing him from the bench, because he would soon be retiring. Pl. Aff. Exs. H, I.

Justice Shaw requested review of the decision of the Commission by the Court of Appeals; in addition, he moved before the Commission for reconsideration on the basis of newly discovered evidence. He presented an affidavit from a new witness, Shelley Williams, who averred, based on her conversations with Ms. Rucker, that the charges were fabricated. After investigation, the Commission determined that the new evidence "did not create a reasonable possibility or a probability that [the] Determination would be altered." Pl.Ex. N. Following this decision, the Court of Appeals unanimously dismissed the request for review of this decision on the ground that it did not have jurisdiction to review the decision not to consider the new evidence. Pl.Ex. P. It also denied review of this determination on appeal of the underlying decision. *In re Shaw*, 96 N.Y.2d 7,12, 724 N.Y.S.2d 672, 675, 747 N.E.2d 1272 (2001).

## Discussion

### I. *The Eleventh Amendment*

#### A. § 1983 Claims

 The State and OCA argue that the § 1983 and State and City Human Rights Law complaints against them are barred by the Eleventh Amendment. They are correct. Absent consent to suit in federal court, or an express statutory waiver, the Eleventh Amendment bars a suit in federal court by a citizen of a state against that state or one of its agencies. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Congress possesses only limited authority to abrogate a state's Eleventh Amendment immunity; in order to do so a statute enacted by Congress must (1) unequivocally express Congress's intent to abrogate state immunity and (2) act under a valid exercise of power. *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).

 The Eleventh Amendment renders OCA and the State immune from suit here under § 1983 or under state law because the State of New York has not consented to suit in federal court, and because no express override of State statutory authority has been enacted by Congress in association with § 1983. *Trotman v. Palisades Interstate Park Commission*, 557 F.2d 35, 38–40 (2d Cir.1977); *Quern v. Jordan*, 440 U.S. 332, 343, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). This immunity extends to state-law claims. *See Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir.1984)(*Pennhurst* bars relief on state-law claims in federal court against state agencies). Plaintiffs do not argue otherwise on either point. Accordingly, the § 1983 claims against OCA and the State are dismissed, as are the state law claims.

#### B. § 1981 Claims

 The Court of Appeals has acknowledged that sovereign immunity also extends to claims under § 1981. *Pikulin v. City University of New York*, 176 F.3d 598, 600–601 (2d Cir.1999)(stating that court would have affirmed dismissal of § 1981 claims against CUNY on Eleventh Amendment grounds if there were sufficient factual basis in record on which to find that CUNY was arm of the State); *see also Yoonessi v. State University of New York*, 56 F.3d 10, 12 (2d Cir.1995)(denying party permission to appeal from decision of magistrate, affirmed by district judge, that dismissed § 1981 claim on either Eleventh Amendment grounds or on basis of failure to state a claim). Other circuits have also repeatedly affirmed the principle that Eleventh Amendment immunity applies to claims made under 42 U.S.C. § 1981. *See, e.g., Thompson v. Washington Metropolitan Area Transit Authority*, 2001 WL 1154420, *1 (D.C.Cir. Aug. 9, 2001) (transit authority, as arm of state, was immune from suit under § 1981); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir.), *cert. denied*, 531 U.S. 1052, 121 S.Ct. 657, 148 L.Ed.2d 560 (2000) (university, as arm of state, enjoys Eleventh Amendment immunity and is immune to claims under § 1981)

Moreover, every district court case within this Circuit that has considered this issue has held that Eleventh Amendment immunity extends to § 1981. *See, e.g., Hill v. Taconic Developmental Disabilities Services Office*, 181 F.Supp.2d 303, 322 (S.D.N.Y.2002)("it is well-settled that § 1981 and § 1983 do not override the Eleventh Amendment immunity afforded states, state agencies, and state officials"); *Kulkarni v. City University of New York*, 2001 WL 1415200 (S.D.N.Y. Nov. 13, 2001)(dismissing § 1981 claim on basis of Eleventh Amendment); *Chinn v. City*

*University of New York School of Law at Queens College*, 963 F.Supp. 218 (E.D.N.Y. 1997)(same); *Cooper v. New York State Dept. of Mental Health*, 2001 WL 456348, *2 (S.D.N.Y. May 01, 2001)("[s]ection 1981 does not abrogate New York State's Eleventh Amendment immunity").

Plaintiff argues that two cases, *Brown v. Oneonta*, 221 F.3d 329 (2d Cir.2000), *cert. denied*, 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001), and the unpublished decision *Sutherland v. New York State Dept. of Law*, 216 F.3d 1073, 2000 WL 730413 (2d Cir.2000), support a waiver of immunity here. Neither case approaches doing so. Indeed, under the Second Circuit's rules, the latter case may not even be cited as precedent. Rather, these cases involve dismissals of § 1981 claims on different grounds and neither contains any discussion of the Eleventh Amendment. The claims against the State and OCA *in eo nomine* under 42 U.S.C. §§ 1981 and 1983 should be dismissed, as should the pendent state law claims.

### C. Claims Relating to State and OCA Harassment Policy

 Although the parties have not discussed this issue, it worth noting that plaintiff also seeks relief against the State and OCA for their failures to make and enforce an effective sexual harassment policy in the state courts. *See* Complaint ¶ ¶ 6, 59–60; Prayer for Relief (seeking *inter alia* mandatory relief requiring sexual harassment training for court staff). *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), recognizes a limited exception to the general principle of sovereign immunity that allows a suit for injunctive relief challenging the constitutionality of a state *official's* actions in enforcing state law or policy. This exception is founded on the theory that such a suit is not one against a state itself, and therefore not barred by the Eleventh Amendment. *CSX Transp. v. New York State Office of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir.2002). However, plaintiff here has not framed her claims as one against any State or OCA official responsible for enforcing or making a sexual harassment training policy. Rather, she has sued the State and the OCA themselves. Moreover, plaintiff makes no allegation that Justice Shaw, the only individual she has sued, was responsible for making or enforcing any such policy. Accordingly, plaintiff's claim fails in this regard as well.

### II. Who is An Employer or Employee Under Title VII?

 Each of the defendants also contend that they may not properly be held liable under Title VII because Ms. Bland cannot be considered an "employee" as that term is defined in Title VII because, as Justice Shaw's secretary, she was a member of his personal staff, and therefore excluded from the coverage of the statute.

### A. The "Personal Staff" of an Elected Official Exemption Under Title VII

 Title VII makes it unlawful for an employer to discriminate against an employee on the basis of sex. *Butler v. New York State Dept. of Law*, 211 F.3d 739, 746 (2d Cir.2000); 42 U.S.C. § 2000e–2(a). Sexual harassment is treated as a form of discrimination under Title VII. *See Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426 (2d Cir.1999)(citing section e–2(a)(1) as basis for hostile work environment claim). Title VII, however, expressly exempts from the definition of "employee" the following persons:

> Any person elected to public office in any state or political subdivision of any State by the qualified voters thereof,

any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office. The exception set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

42 U.S.C. § 2000e(f). Thus, the provision exempts four categories of workers: (1) elected officers; (2)the individuals chosen by such an officer to be members of his or her "personal staff"; (3) such officer's appointees on the policy making level; or (4) an immediate advisor with respect to the exercise of the powers of the office. In addition, civil service workers are expressly removed from the exemption. The question of who is an exempt employee is a matter of federal, not state law, although state law may clearly illuminate the job responsibilities and status of individual considered under the statute. *Calderon v. Martin Co.,* 639 F.2d 271, 272–3 (5th Cir. 1981); *EEOC v. Reno,* 758 F.2d 581, 584 (11th Cir.1985) ("state law is relevant insofar as it describes the plaintiff's position, including his duties and the way he is hired, supervised and fired").

This exemption is identical to exemptions under the ADEA (§ 603(f)), the Fair Labor Standards Act (§ 203(e)(2)(c)), and Equal Pay Act and a number of other statutes. Cases construing the scope of the exception arising under these statutes are therefore instructive here. As the Court of Appeals for the Seventh Circuit observed recently:

> It turns out to be a definition in wide use. Language essentially identical to the first clause of § 630(f) [in the ADEA and to the FLSA's. 29 U.S.C. § 203(e) ] ... appears in the National Labor Rela-

tions Act, 29 U.S.C. § 158(b)(4)(I); the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 402(f); the Employee Retirement Income Security Act, 29 U.S.C. § 1002(6); the Family and Medical Leave Act, 29 U.S.C. § 2611(3) (incorporating § 203(e)); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f); and the Americans with Disabilities Act, 42 U.S.C. § 12111(4). This means on the one hand that a search for legislative purpose is futile—Congress took off the rack language devised, and often used, for subjects other than employment discrimination—and on the other hand that a definition may be secured from opinions that have addressed these other statutes.

*E.E.O.C. v. Sidley Austin Brown & Wood,* 315 F.3d 696, 708 (7th Cir.2002).

The defendants argue that, because plaintiff is a member of the "personal staff" of a person "elected to public office," she is not an "employee" who enjoys the protections offered by Title VII. Although a few cases have considered this issue in a setting different from the present one, the question of whether an elected judge's secretary falls within the "personal staff" exemption appears to be one of first impression. The Second Circuit has yet to address the "personal staff" exemption, as opposed to other portions of the same statutory provision. The cases relating to § 2000e(f) in this Circuit address the "appointee on a policy making level" portion of the exemption. *See, e.g., Butler v. New York State Dept. of Law,* 211 F.3d 739 (2d Cir.2000) (holding on summary judgment the Deputy Bureau Chief in Attorney General's Office was policy maker within meaning of statute so as to exempt her from protection under Title VII); *Tranello v. Frey,* 962 F.2d 244 (2d Cir.1992)(holding under ADEA that policy maker must be chosen by elected

official in order to fall under exemption); *EEOC v. Vermont,* 904 F.2d 794 (2d Cir.1990)(considering under ADEA whether appointed state judges were policy making so as to fall within the exemption, and holding that policy making category was intended to comprise only those policy makers working closely with the elected official), *overruled on other grounds, Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

Turning first to the language of the statute and its legislative history, plaintiff readily meets the definition of "personal staff" intended by Congress. It is undisputed that Justice Shaw was an "elected official." Lippman Aff. ¶ 5. Under New York law, he was entitled to "appoint at pleasure and remove one law clerk and secretary." Judicial Law § 36. Indeed, the powers of the Chief Administrative Judge expressly exclude the ability to appoint and remove "personal assistants who serve as law clerks and personal secretaries to judges and justices." 22 NYCRR § 80.1(b)(3). Plaintiff, while Shaw's secretary, was paid a salary and benefits by the State of New York and was subject to OCA's employment policies regarding the terms and conditions of her employment, such as health benefits, pension benefits, vacation time and sick time. Pl. 56.1 ¶ 22; *See* Lippman Aff. at ¶¶ 21–23. However, virtually all other aspects of her employment (including job responsibilities, performance evaluation, tenure, and discipline) were determined by Justice Shaw. Shaw signed her time sheets and scheduled her vacations. Ms. Bland was chosen by Shaw to be his secretary. She worked in chambers with him exclusively and on a one to one basis—indeed, this is the factual predicate behind her complaint of harassment and her claim of injury caused by Justice Shaw. Shaw was listed as the "appointing authority" on the papers relating to her employment, which he also signed. Lipp-

man Aff. Ex. C. OCA maintains a job description with regard to the position, a description including "typical duties." Lippman Aff. Ex. A. A typical description, under "Distinguishing features of work" reads that "Senior Secretaries to Judges provide personal and confidential legal secretarial services and perform other related duties in the . . . Supreme Courts."

Moreover, although OCA recruits for virtually all other non-judicial positions in the trial courts, and may administer competitive exams for such jobs, it does not recruit law clerks or secretaries to judges; that process is entirely left to the individual judges. Lippman Aff. ¶¶ 9–10. Further, the OCA has no power to discipline State Supreme Court Justices. Rather, pursuant to N.Y. Const. Art. VI, an independent body, the State Commission on Judicial Conduct, has been granted that power. Finally, Part 25 of the Rules of the Chief Judge grants the power "to provide for the employees of the unified court system a career and merit system consistent with the Civil Service Law." 22 NYCRR § 25.1, 25.2. Nonetheless, the "Career Service Rules," promulgated under this enactment, do not apply to the law clerks and secretaries to Justices of the Supreme Court. Plaintiff is exempted from the Civil Service rules, as well as the Career Service Rules established by OCA. Lippman Aff. ¶¶ 8–9, 21–23 (explaining Career Service Rules, and their lack of application to judge's secretaries). Plaintiff therefore falls squarely within the terms of the personal staff exemption set out in Title VII.

Moreover, the legislative history unequivocally indicates that "personal staff" means, first and foremost, "personal secretary." The Senate version of the amendment that first proposed this exclusion exempted "elected officials," their "personal assistants" and their "immediate advisors."

118 Cong. Rec. 4493 (1972); 1972 U.S.C.C.A.N. 2180. Senator Jacob Javits joined Senator Harrison Williams in proposing this language. The Javits/Williams proposal was itself an amendment to one offered by Senator Ervin. Discussing the scope of the amendment, Senator Javits stated in colloquy with Senator Ervin

"I want to be sure that we have no difference of opinion as to what it means ... I have no desire to argue about the fine points of some particular appointment, but generally speaking we consider a personal assistant as being a secretary or, as I have, an administrative assistant, a legislative aide, and then a mayor may have four assistants. So that is what we would understand a personal assistant to be. 'A Secretary,' of course is an accurate designation. He may have two or three secretaries. Important people have more than one."

118 Cong. Rec. at 4493. Senator Ervin agreed, "I think that the change that has been made makes it clear ... However, the suggested change would, I think, express our objective in accordance with what the Senator would expect." *Id.* Immediately after this discussion, the Senate voted to adopt the amendment. *Id.* This "personal assistant" exemption became the "personal staff" exemption after the House of Representatives adopted the amendment, but modified its language. Afterward, both Houses passed the bill.

Similarly, the regulations construing the identical language in the FLSA also explicitly state that a personal secretary is an exempted employee:

(a) Section 3(e)(2)(C) provides an exclusion from the Act's coverage for officials elected by the voters of their jurisdictions. Also excluded under this provision are personal staff members and officials in policymaking positions who are selected or appointed by the elected public officials and certain advisers to such officials.

(b) The statutory term "member of personal staff" generally includes only persons who are under the direct supervision of the selecting elected official and have regular contact with such official. The term typically does not include individuals who are directly supervised by someone other than the elected official even though they may have been selected by the official. *For example, the term might include the elected official's personal secretary, but would not include the secretary to an assistant.*

(c) In order to qualify as personal staff members or officials in policymaking positions, the individuals in question must not be subject to the civil service laws of their employing agencies. The term "civil service laws" refers to a personnel system established by law which is designed to protect employees from arbitrary action, personal favoritism, and political coercion, and which uses a competitive or merit examination process for selection and placement. Continued tenure of employment of employees under civil service, except for cause, is provided. In addition, such personal staff members must be appointed by, and serve solely at the pleasure or discretion of, the elected official.

(d) The exclusion for "immediate adviser" to elected officials is limited to staff who serve as advisers on constitutional or legal matters, and who are not subject to the civil service rules of their employing agency.

29 CFR § 553.11 (emphasis added). *See also Howard v. Ward County,* 418 F.Supp. 494, 502 (D.N.D.1976)(stating that exemptions in § 2000e(f) were "aimed at persons such as members of a governor's cabinet or a mayor's personal secretary (provided they are not protected by state civil ser-

vice)"); *Estate of Pascal v. Benson Co.,* 1995 WL 394374, *4 (D.N.D. Feb. 23, 1995)(unsworn clerical officers/matrons in sheriff's office fell within personal staff exemption of FLSA).

Thus, based on the language of the statute, its structure, and its legislative history, plaintiff falls within the terms of the exemption for an elected official's personal staff. While the Second Circuit has not considered the personal staff exemption, other circuits have developed a variety of tests for ascertaining whether an individual is a member of an elected official's personal staff. The leading case in this area is *Teneyuca v. Bexar County,* 767 F.2d 148, 151 (5th Cir.1985). In *Teneyuca,* the plaintiff, an assistant criminal district attorney, brought a Title VII claim against the Bexar County Criminal District Attorney. In determining whether the plaintiff was an employee as defined by Title VII, the court considered whether the plaintiff was a member of the district attorney's personal staff. The Fifth Circuit exhaustively reviewed the case law relating to the exemption and derived a six factor-test, although the factors were not intended to be exhaustive, to determine whether the plaintiff was a member of the defendant's personal staff. *Id.* Those factors include:

(1) whether the elected official has plenary powers of appointment and

removal, (2) whether the person in the position at issue is personally accountable to only the elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Id.* Noting that the inquiry was usually a factual one, the Fifth Circuit nonetheless concluded that, on defendant's motion to dismiss or in the alternative for summary judgment, defendant was entitled to a dismissal of the complaint because the statutory basis for the plaintiff's job indicated that his hiring and salary were at the sole discretion of the elected official, and the affidavits of the hiring officials to this same effect were unrefuted. *Id.* at 152.

Similarly, *Owens v. Rush,* 654 F.2d 1370, 1375 (10th Cir.1981), on which *Teneyuca* relied, observed that Congress wanted the exception "to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official." Applying this test, an undersheriff, second in authority to the sheriff, was found to be a member of the sheriff's personal staff. The undersheriff admitted he had "a very close working relationship with the sheriff." *Id.* at 1376. The "nature and circumstances" of the employment relationship determined that the personal staff exception applied. *Id. See also, e.g., Nichols v, Hurley,* 921 F.2d 1101 (10th Cir.1990)(deputy sheriffs came within personal staff exemption despite their lack of role in making policy or advising sheriff); *Laurie v. Alabama Court of Criminal Appeals,* 256 F.3d 1266(11th Cir.2001)(staff attorneys were "personal staff" and immediate advisors of elected judge under *Teneyuca* ); *Gunaca v. State of Texas,* 65 F.3d 467 (5th Cir.1995)(for purposes of ADEA, investigator hired by county district attorney was personal staff member because the hiring elected official had plenary authority over investigators, they were accountable only to him, and, even though not high up on the chain of command, they worked with the elected official in a small office); *Monce v. City of San Diego,* 895 F.2d 560 (9th Cir.1990) (deputy city attorney was exempt personal staff member where he held office at the pleasure of the

elected city attorney and represented him in the eyes of the public, despite the fact that he had only limited personal contact with elected official); *Clark v. Tarrant Co., Texas,* 798 F.2d 736(defendant was not entitled to summary judgment where female adult probation officers, although appointed by judges, had little if any real contact with them, and did not represent the elected judge in the public's eyes); *EEOC v. Reno,* 758 F.2d 581 (position of assistant state attorney was exempt because plaintiff represented elected official in eyes of public, had significant degree of official's trust, and served at her pleasure).

In *Manzi v. DiCarlo,* 62 F.Supp.2d 780, 790 (E.D.N.Y.1999), I considered the issue on an incomplete record without deciding it. There, neither party had briefed the question at summary judgment of whether an administrative individual on a State Senator's staff, supervised by two other individuals within the State Senator's offices, was in fact a member of that Senator's "personal staff" so as to exempt her from the applicable statutes. I noted that it was debatable whether merely being on the state payroll, and subject to approval by the Senate Majority leader placed an individual outside the exemption:

> While I have assumed for present purposes that plaintiff is an employee who enjoys the protection afforded by the ADEA, the issue is far from clear ... Plaintiff was described by her attorney as one of the "core of people that actually worked within the Senator's office ..." ... Senator DiCarlo was her appointing authority and she served at his pleasure. While she was technically an employee of the Senate and her appointment by Senator DiCarlo was subject to ratification by the Senate Majority Leader ... it is arguable whether this formal mechanism alters the nature of the relationship between a Senator and his personal staff. .... Nevertheless,

because this ground was not asserted as a basis for summary judgment, and because "the highly factual nature of the inquiry necessary to the determination of the 'personal staff' exception does not lend itself well to disposition by summary judgment," *Teneyuca* ... I merely note this issue without deciding it.

*Id.* (full citation omitted).

An examination of the six factors set out in *Teneyuca* under the present circumstances lends further support to the conclusion that Ms. Bland was a member of Justice Shaw's "personal staff." Justice Shaw had plenary statutory authority to appoint plaintiff or remove her from the secretarial position at issue. Ms. Bland was wholly and solely responsible to Justice Shaw in the performance of her job duties, who had complete control over the position and her responsibilities. Moreover, Ms. Bland was personally supervised by Shaw without any intermediaries. In addition, by answering Justice Shaw's phone and attending his chambers, plaintiff represented Justice Shaw in the eyes of the public. Under these circumstances, plaintiff possessed an intimate and sensitive working relationship with Justice Shaw. *See, e.g., Brewster v. Pike,* 608 F.Supp. 1163, 1169 (W.D.Va.)(stating "with regard to plaintiff hired to work as a confidential secretary to official that [t]he statutes are meaningless when they refer to the 'personal staff' of a public official if they do not apply in this case"), *revs'd on other grounds,* 788 F.2d 985 (4th Cir.1986).

This conclusion is underscored by another area of analogous law: the exception permitting the firing by politicians of confidential employees and policy makers without raising any First Amendment constitutional issues. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct.

1287, 63 L.Ed.2d 574 (1980). Indeed, some Circuits hold this constitutional exemption is congruent with the exemptions under statutes such as Title VII. *See Americanos v. Carter,* 74 F.3d 138, 143–44 (7th Cir.1996)(reasons for exempting policy makers from First Amendment ban on political patronage dismissals apply with equal force to determination of whether plaintiff bringing suit under Title VII and the ADEA is an appointee on the policy making level). Although the Second Circuit has declined to use the same test for both the *Elrod* exemption and another portion of the statutory exemption at issue here without discussion, *Butler v. New York State Dept. of Law,* 211 F.3d 739, 746, it has not considered this question in the present context.

Under this line of authority, an elected official's personal secretary is a "confidential employee" for the purposes of determining whether or not an employee can be fired on political grounds. *Faughender v. City of North Olmsted, Ohio,* 927 F.2d 909 (6th Cir.1991)(mayor's secretary, even though she may not have performed political or policy-oriented tasks, could be fired for political reasons because the inherent duties of position required access to flow of political information); *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988)(secretary to policy maker may be fired for political reasons under *Elrod* ). The relevant inquiry is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. 1287. As explained in *Faughender:*

> [A] mayor's secretary must undertake those functions in relations to the flow of information, whether by writing, speech, or personal visit, to and from the mayor's office, that the mayor wants the secretary to perform.

A particular secretary's duties may be circumscribed, but the function of the office is constant. As a political action cannot occur without communication, a position that controls the lines of communication of a political actor must be inherently political. Viewed in its functional aspect, a mayor's secretary is clearly the type of position that involves access to confidential and political material, and political loyalty, whether partisan or personal, is an essential attribute of the job.

927 F.2d at 913–14.

These cases are analogous to the situation at hand because they bear directly on the one of the central *Teneyuca* factors: the intimacy and confidential relationship between an elected official and his or her secretary in the performance of the official's duties. As held in *Faughender,* an elected official's personal secretary occupies a position of trust and sensitivity because, at a functional level, he or she controls the flow of information to and from the official. As much is true in the present case; while Ms. Bland did not determine the substance of her work, she nonetheless had control, as a functional matter, of the flow of information into and out of chambers. Such responsibilities place her by definition in a "sensitive" and "intimate" position of trust, and render her a member of the judge's personal staff.

Plaintiff nonetheless seeks to argue that because plaintiff did not make policy or advise the judge substantively she cannot fall within the exemption. In doing so, she relies on a series of cases decided in the Fourth Circuit. *See, e.g., Curl v. Reavis,* 740 F.2d 1323, 1328 (4th Cir.1984)(employee of sheriff who lacked intimate and sensitive working relationship with him, and did not report directly to him, was not personal staff member); *Brewster v. Barnes,* 788 F.2d 985, 990–91 (4th

Cir.1986)(correctional officer in position compensated by county who did not occupy intimate or high position in sheriff's department was not personal staff member, despite previous position as personal secretary to the elected sheriff); *United States v. Gregory*, 818 F.2d 1114, 1116–17 (4th Cir.1987) (fact that road deputies to elected sheriff worked in small office with him did not make them personal staff members where they were not involved in policy and did not have a "highly intimate" relationship which influenced the making of policy); *Cromer v. Brown*, 88 F.3d 1315, 1323–24 (4th Cir.1996)(plaintiff lieutenant sheriff was not member of sheriff's personal staff where plaintiff rarely saw sheriff, did not report directly to sheriff, had no role in creating or discussing policy, held position created and compensated by state law and could take complaints to a grievance board; however, as a captain, plaintiff fell within exception because he was personally promoted and demoted by the sheriff, had no grievance procedures available, took a role in policy making and represented the sheriff in the eyes of the public). In essence, plaintiff contends that whatever the intimacy of plaintiff's role as a secretary in a judge's chambers, working solely for that judge, and appointed or dismissed "at his pleasure," the fact that she performed only administrative and clerical tasks and not substantive legal work means that she cannot fall within the "personal staff" exception.

This argument fails. First, although the cases in the Fourth Circuit are somewhat inconsistent in this regard, to the extent that the Fourth Circuit's analysis can be viewed as conflating two categories of exemption—turning the "personal staff" and "policy making" exemptions into a single statutory exclusion—such an approach is incorrect. If, as plaintiff urges, some kind of active role in the policy making functions of the office were necessary to render a staff member exempt under the statute, then the "policy making" and "personal staff" exemptions would be collapsed into a single category, rendering the separate "personal staff"exemption surplusage. *See Tranello v. Frey*, 962 F.2d at 249 (explicitly reading each clause of similar statute as separate and distinct categories of exemption in construing "policy making" exemption under 2000e(f)); *Gregory v. Ashcroft*, 501 U.S. at 465, 111 S.Ct. 2395 (looking separately at each category of exemption in construing statute). Indeed, in *Nichols v. Hurley*, 921 F.2d 1101 (10th Cir.1990), a split panel of the Tenth Circuit explicitly declined to adopt the Fourth Circuit's reasoning. *Nichols*, 921 F.2d at 1108. The Tenth Circuit concluded that the Fourth Circuit had considered factors that generally go to the other exceptions to the definition of employee, not the personal staff exception. "[A] person can be a member of an elected official's personal staff and not be either a policymaker or an immediate adviser with respect to the constitutional and legal powers of the elected official." *Id.*

Second, the Fourth Circuit has at least recognized implicitly that a personal secretary falls within the exemption. In *Brewster v. Barnes*, 788 F.2d 985, it evaluated the application of the personal staff exemption to the plaintiff deputy sheriff (who had previously served as the sheriff's secretary) as follows:

From 1975 to 1979 Brewster ... did not occupy an intimate or high level position in the Sheriff's Department, nor did she make policy decisions. Rather, she performed the same functions as the other correctional officers at the jail: handling, transporting, and supervising prisoners; searching visitors; and various jobs such as recordkeeping, cooking, and cleaning. In short ... Brewster

was not a member of [the Sheriff's] personal staff.

*Id.* at 990–91.

Strikingly, however, the reasoning of *Brewster* left untouched the finding of the district judge that a personal secretary would fall within the exception. During a time period prior to the one that provided the basis for her claims, plaintiff, as the sheriff's secretary, had worked closely with the defendant, sharing an office, performing secretarial tasks for and being personally supervised by the defendant. Specifically, the district judge in *Brewster* had held:

> [Plaintiff] enjoyed a close, personal, and confidential relationship with the Sheriff, who had known her before she was employed and had, in fact, recruited her for employment. Mrs. Brewster served with the Sheriff in a confidential capacity as secretary in a room so small that their desks touched. The Sheriff placed great trust in her as a confidential employee, even permitting her to leave at her pleasure when she felt her work was completed, rather than restricting her to any particular hours. Mrs. Brewster, in fact, acted as treasurer in Sheriff Shockley's political campaign while she was working in his office. When she began to work as a corrections officer, the plaintiff reported directly to the Sheriff rather than to anyone else in the chain of command. She understood that her employment was political and that it ended with the term of the Sheriff who appointed her. The statutes are meaningless when they refer to the "personal staff" of a public official if they do not apply in this case.

*Brewster v. Pike,* 608 F.Supp. at 1169. Reviewing this finding, the Court of Appeals found that the district court below had used the wrong time frame in examining the plaintiff's employment, and therefore its holding was incorrect:

> The time frame of our inquiry must be the period from 1975 to 1979 in which the discrimination purportedly occurred. Immediately prior to the 1975 election, Shockley hired a new personal secretary because Brewster was then working full time as a correctional officer at the jail. The evidence reveals that any close working relationship which existed between Brewster and Shockley prior to 1975 had essentially ended once Shockley moved his office out of the jail, while Brewster remained behind as a full-time correctional officer

*Brewster v. Barnes,* 788 F.2d at 990 (4th Cir.1986). Thus, the Fourth Circuit's reasoning implicitly accepted the holding below that a personal secretary of an elected official, working closely with him, is not an employee for the purposes of Title VII. As reasoned there, "the statutes are meaningless . . . if they do not apply in this case." 608 F.Supp. at 1169.

Plaintiff also asserts that she is not a member of the judge's "personal staff" because OCA approved the papers appointing her, maintained a job description for the position, set the salary level, maintained her employment (keeping her on payroll and offering her an alternative position) after Justice Shaw terminated her, and provided an avenue for complaint through its EEO office. There is some support for this assertion in the cases. *See U.S. v. Gregory,* 818 F.2d at 1117 (fact that individual was county employee compensated by state cut against application of exemption); . *Cromer v. Brown,* 88 F.3d at 1323 n. 6 (explaining that "when a position is created and compensated under state law, the elected official is not required to allocate funds from his discretionary budget to pay the employee's salary"). However, the fact that plaintiff was not on

Justice Shaw's personal payroll and that he did not control her pay or benefits does not necessarily lead to the conclusion that she was not on his "personal staff." *See Manzi v. DiCarlo,* 62 F.Supp.2d 780, 790. If it did, then *any* elected official's personal staff member, chosen by that official, serving at his pleasure, whose salary and employment nonetheless ultimately stemmed from a governmental authority could fall outside the exemption regardless of the intimacy of the working relationship. This would effectively eradicate this entire category of exemption, since few elected officials' personal staff members are wholly administered and paid for personally. This cannot be correct. Rather, this approach to the problem is better viewed as another way of looking at the personal nature of the appointment and the intimate and sensitive nature of the job. In a case like the present one, where it is clear that there is an exclusive working relationship and sole personal accountability to the elected official, the issue should be of less importance.

Plaintiff also suggests that, at this juncture, this issue is one of fact rather than one of law, and not properly decided on these cross-motions to dismiss and for summary judgment. Indeed, in *Manzi v. DiCarlo,* 62 F.Supp.2d 780, 790, citing *Teneyuca,* I recognized the fact-intensive nature of the determination of whether an individual falls within the personal staff exemption where the scope of the exemption and the facts were uncertain. *See, also, e.g., Clark v. Tarrant County Texas,* 798 F.2d 736 (application of exemption to case where facts were unclear was fact issue); *Leving v. City of Chicago,* 1988 WL 20046, *1–3 (N.D.Ill. March 1, 1988)(question of whether Chicago mayor Harold Washington's administrative secretary was member of his personal staff was one of fact, inappropriate for resolution from face of pleadings on 12(b)(6) motion).

That being said, in the present case there are no issues of fact with regard to the question to be resolved on the motion. It is proper to take notice of the applicable statutes and administrative materials under which the plaintiff was appointed and performed her job, *see Teneyuca v. Bexar County,* 767 F.2d 148, 151 (5th Cir.1985)(unrefuted affidavit from defendant about job duties could be considered on motion to dismiss or in the alternative for summary judgment based on personal staff exemption); in addition, there is no material issue of fact as to what plaintiff's job responsibilities were. Even accepting plaintiff's representation that further evidence will show that her job responsibilities were entirely and exclusively ministerial, typing personal and court documents, and answering phones in chambers, no issue of fact exists as to whether she should be viewed as a member of an elected official's "personal staff." *See, e.g., EEOC v. Reno,* 758 F.2d at 584 (upholding grant of motion to dismiss that plaintiff was not "employee" within meaning of personal staff exemption to statute; court based its holding primarily on duties of the job as defined by statute); *Butler,* 211 F.3d at 748–49 (holding that court need not accept Deputy Attorney General's testimony and look beyond description of position in order to find an "intimate" working relationship with State Attorney General for purposes of policy making exemption under § 2000e(f)); *Teneyuca,* 767 F.2d at 152 (where statutory duties of office were clear, judgment could be granted on the pleadings and affidavit of defendant, despite fact-based nature of inquiry).

Finally, plaintiff seeks to rely on the fact that the EEOC explicitly found that OCA was an "employer" for the purposes of the statute. However, being an "employer" for the purposes of the statute is a different thing from being exempt from the

definition of employee; these two definitions are covered by different portions of the statute. *Compare* 42 U.S.C. § 2000e(b) (defining employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.") *with* 42 U.S.C. § 2000e(f) (defining employee). The EEOC did not address the issue of whether plaintiff came within the category of employees who are not covered by Title VII; because she does, the Title VII cause of action must be dismissed.

Moreover, even if the EEOC had reached this issue, it would not preclude consideration of the question in this case. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 799, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("in view of the large volume of complaints before the Commission and the nonadversary character of many of its proceedings, court actions under Title VII are de novo proceedings ..."); *Nealon v. Stone,* 958 F.2d 584, 588 (4th Cir.1992)( [u]nder the procedures applicable to private employers ... when the EEOC finds reasonable cause of discrimination, either side can litigate the claim de novo in district court).

## B. Plaintiff's Claim of Retaliation

The dismissal of plaintiff's Title VII claim requires the dismissal of plaintiff's retaliation claim, which generally sounds only under Title VII, rather than as a First Amendment violation under 42 U.S.C. § 1983. A claim under § 1983 requires that a plaintiff establish a deprivation of a constitutional right under "color of state law." A claim of retaliation for complaining about sexual harassment that affected only the plaintiff does not raise an actionable constitutional claim under the First Amendment. "[W]here the primary aim of an employee's speech is to seek redress for a personal wrong, the speech is not protected by the First Amendment merely because its subject matter 'may affect the public'." *Tiltti v. Weise,* 155 F.3d 596, 603 (2d Cir.1998). *See Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.1993)(claim that termination was retaliatory in violation of First Amendment did not sound constitutionally because the reason for termination was not that plaintiff wanted to debate issues of sex discrimination, or that she "sought relief against pervasive or systemic misconduct by public agency or public official"); *Payne v. Meeks,* 200 F.Supp.2d 200, 206 (E.D.N.Y.2002). While plaintiff alleges in her complaint that inadequate sex harassment training was offered in the court system, and that the avenues of complaint open to her were insufficient, it is undisputed that the complaint framed by plaintiff in 1997 which went to the EEOC, and which allegedly caused her firing in April 1998, more than two years before the filing of the complaint in this matter, addressed only her own treatment by Justice Shaw. *See* Pl.Ex. G. As such, as in *Saulpaugh,* no actionable constitutional violation has been pled. 4 F.3d 134, 143 (no First Amendment claim of retaliation when plaintiff's complaints that she alleged caused her firing "were motivated by and dealt with her individual employment situation").

## C. Other Defenses to Title VII Liability

Because plaintiff falls within the personal staff exemption, and therefore cannot bring suit under Title VII, I need not discuss the parties' various alternative arguments relating to their potential liability under Title VII. Specifically, (1) Shaw and OCA argue that neither of them can be considered plaintiff's "employer" under the statute, (2) OCA claims that the racial

discrimination claim was not exhausted, and (3) the State claims that it was not properly named as a party in the EEOC complaint. Nevertheless, for the sake of completeness, I address these claims as well.

### 1. Who May be Liable as an Employer under Title VII

■■■ Defendant Shaw is not an "employer" for the purposes of Title VII. While an individual may be an employer for the purposes of the statute, provided he employs more than 15 people. 42 U.S.C. § 2000(e)(a) and (b), Justice Shaw does not meet this requirement. Moreover, assuming Justice Shaw could be viewed as Ms. Bland's supervisor under the employ of OCA (which is dubious, as discussed below), he still could not be liable. Under *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995), individual supervisors, rather than "employers" are not liable. *See also, e.g., Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).

■■■ However, OCA's argument that it could not be liable under Title VII because Justice Shaw was not its agent misses the mark. It is true that in order to hold an employer liable for sexual harassment the plaintiff must show that "a specific basis exists for imputing *the conduct that created the hostile environment* to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir.1997)(emphasis added). Moreover, to establish liability on the theory that a supervisor exploited the agency relationship in committing the harassment, a plaintiff "must allege facts which establish a nexus between the supervisory authority" and the harassment. *Torres v. Pisano*, 116 F.3d 625, 635 (2d Cir.1997).

OCA argues that it neither hires an elected judge, fires him, oversees his hir-

ing practices, oversees him in the exercise of his professional duties, nor disciplines him for violations of applicable legal or ethical rules. It also points out that the job of hiring and firing secretaries is statutorily delegated to the individual judge. It therefore contends that, under general principles of agency, Justice Shaw cannot be its agent with regard to the claimed harassment. While this is true as far as it goes, it does not necessarily follow from the allegations of the complaint that OCA could have no liability here as an "employer." If OCA failed to implement adequate sexual harassment training and awareness programs, or failed to establish adequate avenues for complaint, it could be held liable in the same manner as an employer for co-worker or third-party harassment. *See Karibian v. Columbia Univ.*, 14 F.3d 773, 779 (2d Cir.1994). Under these circumstances, which neither party has briefed on the cross-motions, OCA's liability would not stem from its agency relationship with the judge, but rather from its failure to adequately perform its administrative functions for all court personnel.

### 2. Exhaustion of the Racial Discrimination Claim

■■■ A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is "reasonably related" to that alleged in the EEOC charge. *Butts v. City of New York Dept. of Housing Preservation and Development*, 990 F.2d 1397, 1401–02 (2d Cir.1993); *Stewart v. United States Immigration and Naturalization Service*, 762 F.2d 193, 198 (2d Cir. 1985). This exhaustion requirement is an essential element of Title VII's statutory scheme. The purpose of the notice provision, which is to encourage settlement of discrimination disputes through concilia-

tion and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC. *Butts*, 990 F.2d at 1401–02; *see also Stewart*, 762 F.2d at 198 ("the purpose of the [Title VII] exhaustion requirement ... is to give the administrative agency the opportunity to investigate, mediate, and take remedial action ..."). *See, e.g., Magee v. Nassau County Medical Center*, 27 F.Supp.2d 154, 159–60 (E.D.N.Y.1998)(where plaintiff raised claim of racial discrimination in previous EEOC complaint, but never raised it again in relevant complaint, court could not hear claim as one under Title VII).

OCA argues that the racial discrimination claim under Title VII is barred by plaintiff's failure to raise it before the administrative agency. OCA's argument fails because the claim *was* raised before the administrative agency. *See* Pl.Ex. D ¶¶ 9, 16, 21 and 22 (allegations in State Human Rights Complaint, referred to EEOC, that (1) Justice Shaw—who is African American—said that it was a shame to have children with darker-complected African–American women (Ms. Bland is light-skinned); (2) that he didn't know how anyone could "lie down" with such women, when women who looked like Ms. Bland were available; (3) that such comments constituted racial discrimination and racial harassment).

3. *Failure to Name the State as A Party Before the EEOC*

█ The State's argument that, because it was not named as a defendant in the EEOC complaint, the Title VII claims against it were not properly exhausted and must be dismissed has somewhat more merit. As previously explained in considering this issue in the analogous context of an ADA and ADEA claim:

The purpose of naming the defendant in the filing with the EEOC is that "the charge serves to notify the charged party of the alleged violation and also brings the party before the EEOC, making possible effectuation of the Act's primary goal of securing voluntary compliance with its mandates." *Eggleston v. Chicago Journeymen Plumbers' Local Union*, 657 F.2d 890, 905 (7th Cir.1981). With "this two-fold purpose in mind, courts have recognized several exceptions to the rule that parties not named in the EEOC charge are not subject to suit in a private civil action."

*Manzi v. DiCarlo*, 62 F.Supp.2d at 786. The Second Circuit recognizes an "identity of interest" exception to the rule requiring exhaustion, an exception which hinges on four factors:

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;

2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;

3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;

4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Manzi*, 62 F.Supp.2d at 787 (citing *Johnson v. Palma*, 931 F.2d 203, 209–10 (2d Cir.1991)(quoting *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3rd Cir.1977))). The "identity of interest" exception is in-

tended to protect parties who may have served the wrong defendant with their EEOC filing because they were "not versed in the vagaries of Title VII and its jurisdictional and pleading requirements," *Johnson*, 931 F.2d at 209.

Examining the purposes of the exhaustion rule in the context of a claim where the plaintiff named only her immediate employer, a New York State Senator, and not the State or the State Senate, who were also named as defendants in the federal proceeding, I held that the failure to exhaust was no bar to the suit against the State Senate. *Manzi*, 62 F.Supp.2d at 787–88. There, the State Senate delegated to the Senator the power to determine whether or not the State Senate could participate in the proceedings, and the Senate had notice of the EEOC complaint and did not investigate or seek to participate. Under these circumstances, not only did the Senate have notice, but the plaintiff could "reasonably conclude" that the addition of the Senate "to the conciliation effort would have made little if any difference." *Id.* (citing and quoting *Eggleston*, 657 F.2d at 907). Moreover, examining the four factors set out by the Second Circuit for determining whether there was an identity of interest in *Johnson v. Palma*, the two most significant, which went directly to the policy of allowing a defendant to obtain the benefits of conciliation, tipped in favor of plaintiff. The Senate had unequivocally conferred on the Senator the decision relating to conciliation, and there was no prejudice to the Senate because the EEOC took no conciliation action. *Id.*

These principles raise similar questions in the present case as to whether exhaustion of remedies as against Justice Shaw and the OCA should be deemed to amount to exhaustion as against the State. Here, while the State claims that it was not properly served, no argument has been raised that it did not have notice of the claim. Moreover, no explanation has been supplied as to why OCA did not or could not adequately represent its interests in any conciliation attempts. Indeed, for all practical purposes OCA was the State. Given the clear notice to all parties, and the lack of any identified prejudice, were this issue more squarely presented, I would remain disinclined to grant dismissal of a civil rights law suit on the primarily technical grounds advanced here.

### 4. *Election of Remedies*

■ Defendant Shaw also argues that the State and City Human Rights Laws in the present action are barred by the filing of the administrative complaint. This claim is without merit. Although a claim in any court—even a federal court—under the relevant state and city statutes is barred where a prior administrative proceeding has been filed, that rule does not mean the claims against Justice Shaw should be dismissed. The State Human Rights law provides that:

Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages ... and such other remedies as may be appropriate ... unless such person had filed a complaint [with the State Human Rights Commission] or with any local commission on human rights ... [unless] the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled.

N.Y. Exec. Law 297(9). Similarly, the City Human Rights law provides:

Any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title or

by an act of discriminatory harassment or violence as set forth in chapter six of this title shall have a cause of action in any court of competent jurisdiction for damages, and for injunctive relief and such other remedies as may be appropriate unless such person has filed a complaint with the City Commission on Human Rights or with the State Division of Human Rights with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence.

N.Y. Admin. Code § 8–502(a) ¶ 10.

■ Thus, "[i]n general, a party who has filed a complaint with the New York City Commission on Human Rights ... claiming to be aggrieved by an unlawful discriminatory practice is precluded from filing a claim under the NYCHRL in any court for damages from that unlawful discriminatory practice." *Anatsui v. Food Emporium*, 2000 WL 1239068, at *5 (S.D.N.Y. Sept. 1, 2000). However, an exception exists where the administrative agency dismisses the claim for administrative convenience. *Id.* (citations omitted).

In the present case, plaintiff submitted a Verified Complaint to the New York City Commission on Human Rights ("CCHR") dated May 14, 1998 naming OCA and Shaw as respondents and alleging discrimination based on gender, race and color. Pl Ex. D. By letter dated March 14, 2001, Randolph E. Wills, Deputy Commissioner of the Commission's Law Enforcement Bureau wrote to plaintiff's counsel that:

Because there was some question as to the jurisdiction of the New York City Commission on Human Rights to entertain a complaint asserted against the New York State Unified Court System, the complaint was forwarded to the United States Equal Employment Opportunity Commission for filing and processing ... As the above-captioned matter was transferred for filing to the federal agency, it was never filed at the New York City Commission on Human Rights. At no time did the New York City Commission on Human Rights exercise jurisdiction over this matter.

Pl.Ex. R.

On April 17, 1998, the State Division of Human Rights ("SDHR"), with whom the complaint was filed, issued an "Administrative Convenience Dismissal." That document stated, *inter alia,* that

On May 20, 1998, the SDHR received and filed the above-entitled complaint upon a deferral from the U.S. Equal Employment Opportunity Commission. (EEOC). The EEOC and SDHR agreed that the EEOC would conduct the initial investigation. In accordance with the agreement, the Division has waived initial processing of the complaint.

· Under these circumstances processing by the Division would not serve the goals of the State Human Rights Law and notifying the complainant for hearing would be undesirable. The complaint, therefore, is ordered dismissed on the grounds of administrative convenience.

Pl.Ex. S. The document then went on to cite and quote § 297.9 of the N.Y. Human Rights Law which reads as follows: "Where the Division has dismissed such complaint on the grounds of administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed."

By letter dated May 15, 1998, the managing attorney of CCHR's Law Enforcement Bureau, wrote to the EEOC that she was forwarding plaintiff's case to the EEOC because "[a]s respondent is a State agency, the Commission does not have jurisdiction over this matter." Pl.Ex. E.

Thus, according to the CCHR, the complaint submitted to it was never filed there, but was forwarded to the EEOC. The complaint filed with the SDHR was dismissed for reasons of "administrative convenience." The rule of election of remedies therefore does not supply relief to Justice Shaw.

### III. *Statute of Limitations*

██ Shaw argues that the § 1983 claim and accompanying state-law claims are barred by the three year statute of limitations, which places only the most recent of the claimed offensive comments and actions, the remarks made in early November 1997, within the statutory period. Moreover, it is clear that in the course of her twelve-year tenure with Justice Shaw Ms. Bland had full knowledge of facts which should have put her on notice of her claim far earlier than November 1997. Plaintiff nonetheless argues that the "continuing violation" doctrine should toll the statute of limitations here.

In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002), the Supreme Court considered the application of the statute of limitations claims of retaliation and hostile work environment brought under Title VII against the railroad by a former employee. While, as in the present case, some of the discriminatory acts in *Morgan* took place within this statute of limitations period, many occurred earlier. The Court issued a bipartite ruling. First, it held that "discrete discriminatory acts [such as termination, failure to promote, denial of transfer, or refusal to hire] are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *National R.R. Passenger Corp.*, 122 S.Ct. at 2072. Second, the Court held that a hostile work environment claim should be reviewed in

its entirety, so long as one of the events comprising it fell within the statute of limitations. Specifically, the Court emphasized:

> A hostile work environment claim is comprised 'of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1).... It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 2074. The law relating to continuing violations under Title VII has traditionally been held to apply by analogy to § 1983 claims. *See, e.g., Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir.1994)(analyzing statute of limitations defense under 42 U.S.C. § 1983 in same manner as Title VII claim). Nonetheless, the reasoning in *Morgan* turned on the language of Title VII, which renders a single "employment practice," such as a hostile work environment, the predicate for recovery under the statute. This analysis may not automatically extend to § 1983 and § 1981 actions, since they are not based on similar statutory language. Nevertheless, I need not resolve this issue here because the Second Circuit precedent prior to *Morgan* suggests that it would reach the same result on the record here applying its pre-*Morgan* continuing violations rule. *See Fitzgerald v. Henderson*, 251 F.3d 345 (2d Cir.2001); *id.* at 371 (Korman, J., dissenting)(noting conflict among the circuits on the issue).

Thus, plaintiff's allegations relating to her harassment claim falling outside the statute of limitations are not barred because her claim is based on a hostile work

environment created by her supervisor, and the last acts constituting part of that claim took place within the limitations period.

## IV. *Collateral Estoppel*

▮ Plaintiff also seeks summary judgment in her favor against Justice Shaw on the sexual harassment and retaliation claims. Plaintiff argues that the issues litigated in the prior disciplinary proceeding and determined in favor of Ms. Bland are entitled to preclusive effect here and require entry of summary judgment in her favor on the sexual harassment and retaliation claims. Justice Shaw contends that collateral estoppel should not apply here because of the lack of any available appeal or review of the determination not to permit him to present new evidence proffered by him relating to whether the charges against him were fabricated, and the manner in which that evidence was taken by the Commission.

▮ Under the principles of full faith and credit set out in 28 U.S.C. § 1738, a federal court must give to a state court judgment the same preclusive effect as would be given to the judgment under the law of the state in which the judgment was rendered. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996). This rule applies with equal force to actions brought under 42 U.S.C. § 1983. *Allen v. McCurry,* 449 U.S. 90, 103–04, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). New York law therefore governs the determination of what preclusive effect would be given to factual findings made by the Commission.

▮ In New York, the doctrine of collateral estoppel, or issue preclusion, "bars a party from relitigating in a subsequent proceeding an issue clearly raised in a prior proceeding and decided against that party where the party to be precluded had a full and fair opportunity to contest

the prior determination." *Weiss v. Manfredi,* 83 N.Y.2d 974, 976, 616 N.Y.S.2d 325, 639 N.E.2d 1122 (1994). There are two requirements for the invocation of the doctrine of collateral estoppel: (1) "[t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action" and (2) "there must have been a full and fair opportunity to contest the decision now said to be controlling." *Schwartz v. Public Administrator of Bronx. Co.,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969). With regard to the first portion of this test, "gratuitous" findings, that is, those not essential to the determination, lack a preclusive effect. "A finding of fact in an earlier proceeding, even though put in issue by the pleadings there, is not binding in a later proceeding, if the finding of fact was not essential to the determination of the earlier proceeding." *Menna v. Joy,* 86 A.D.2d 138, 141, 449 N.Y.S.2d 48, 49 (1st Dep't 1982)(citing *Silberstein v. Silberstein,* 218 N.Y. 525, 113 N.E. 495 (1916)); *see also Wilder v. Thomas,* 854 F.2d 605, 620 (2d Cir.1988).

▮ Although there is no gloss offered by the New York case law on the term "decisive of the present action" in the standard, "the most reasonable construction of this term is as follows: an issue is 'decisive in the present action' if it would prove or disprove, without more, an essential element of any of the claims set forth in the complaint. A stricter definition of the term would render collateral estoppel virtually indistinguishable from res judicata; a broader definition would leave the additional requirement of 'decisiveness' without meaning." *Curry v. City of Syracuse,* 316 F.3d 324, 332–33 (2d Cir.2003).

▮ A determination whether the first action or proceeding genuinely provided a full and fair opportunity requires

consideration of "the 'realities of the [prior] litigation', including the context and other circumstances which ... may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him." *People v. Plevy*, 52 N.Y.2d 58, 65, 436 N.Y.S.2d 224, 417 N.E.2d 518 (1980). Among the specific factors to be considered are the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation. *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 423 N.E.2d 807(1981); *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955, 246 N.E.2d 725.

The application of collateral estoppel applies only where the circumstances indicate the issue estopped from further consideration was thoroughly explored in the prior proceeding, and that the resulting judgment thus has some indicia of correctness. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir.1986). Under New York law, appellate review generally plays a central role in safeguarding the correctness of judgments. *Malloy v. Trombley*, 50 N.Y.2d 46, 51, 427 N.Y.S.2d 969, 405 N.E.2d 213 (1980). Collateral estoppel cannot be applied without first considering the availability of such review. If a party has not had an opportunity to appeal an adverse finding, then it has not had a full and fair opportunity to litigate that issue. *People v. Medina*, 208 A.D.2d 771, 772, 617 N.Y.S.2d 491 (2d Dep't 1994); *Gelb*, 798 F.2d at 44; *accord* Restatement (Second) of Judgments § 28(1)(2002).

The doctrines of res judicata and collateral estoppel give conclusive effect to the quasi-judicial determinations of administrative agencies, as well as to determinations by courts. *Matter of Evans v. Monaghan*, 306 N.Y. 312, 323–324, 118 N.E.2d 452 (1954); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Collateral estoppel applies to determinations rendered pursuant to the adjudicatory authority of an agency to decide cases brought before its tribunals employing procedures substantially similar to those used in a court of law. *Venes v. Community School Bd.*, 43 N.Y.2d 520, 524, 402 N.Y.S.2d 807, 373 N.E.2d 987 (1978); *Bernstein v. Birch Wathen School*, 71 A.D.2d 129, 132, 421 N.Y.S.2d 574 (1st Dep't 1979), *aff'd.* 51 N.Y.2d 932, 434 N.Y.S.2d 994, 415 N.E.2d 982(1980); *see also Newsday, Inc. v. Ross*, 80 A.D.2d 1, 5, 437 N.Y.S.2d 376 (2d Dep't 1981). "In the application of collateral estoppel with respect to administrative determinations, the burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in prior action or proceeding." *Ryan v. New York Telephone Co.*, 62 N.Y.2d 494, 501, 467 N.E.2d 487, 491, 478 N.Y.S.2d 823, 827 (1984).

Under these principles, in the context of determining whether findings from a professional disciplinary hearing could preclude issues in a later civil action, the New York courts have carefully examined the nature of the procedural protections available to the defendant in the administrative proceeding, the availability and similarity of the procedures in the two proceedings, and the identity of legal and factual issues in the administrative and legal proceedings. Thus, for example, in *Stevenson v. Goomar*, 148 A.D.2d 217, 544 N.Y.S.2d 690 (3d Dep't 1989), a plaintiff

sought recovery in tort for injuries allegedly sustained as a result of the professional malfeasance of her doctor whose license to practice medicine had subsequently been revoked. Relying on the differences between the administrative proceeding and the legal proceeding, specifically, the availability of a jury trial, the lack of discovery, the inapplicability of the rules of evidence to the administrative proceeding, and the limited scope of factual review available for an administrative proceeding, as well as the fact that the doctor had not chosen the administrative forum in which to litigate, the court declined to apply collateral estoppel to the findings in the disciplinary proceeding. It reasoned that:

> [a] ruling in favor of plaintiff herein would effectively make the administrative agency in a disciplinary proceeding the ultimate fact finder, with only limited judicial review, in any tort action arising out of the alleged misconduct, thereby depriving a defendant of a number of valuable rights traditionally associated with civil actions.

148 A.D.2d 217, 220–21, 544 N.Y.S.2d 690, 692.

Similarly in *Jeffreys v. Griffin*, 301 A.D.2d 232, 749 N.Y.S.2d 505, 2002 N.Y. Slip Op. 07901, (1st Dep't October 31, 2002), the Appellate Division cited and relied on the reasoning of *Stevenson*, and declined to apply issue preclusion to the findings of a medical board. The Appellate Division noted that the finding that the defendant doctor engaged in professional misconduct by having sexual contact with his patient did not amount to a finding that the defendant "by a preponderance of the evidence, acted with the requisite intent necessary for the torts presently alleged." *See* 301 A.D.2d 232, 749 N.Y.S.2d 505, 510–511. In particular, the First Department warned against "an

unsettling precedent in which purportedly aggrieved [parties] may use disciplinary proceedings, lacking in the full panoply of discovery and procedural safeguards codified in our civil law, to trump the professionally licensed defendant's recourse to a defense against claims in a civil trial." *Id. Compare Ryan v. New York Tel.*, 62 N.Y.2d 494, 501, 467 N.E.2d 487, 491, 478 N.Y.S.2d 823, 827 (where *plaintiff* initiated prior administrative proceeding for unemployment benefits in which he had full opportunity to litigate, and to appeal, issues determined would have preclusive effect on later tort action brought by plaintiff); *A to Z Assoc. v. Cooper*, 161 Misc.2d 283, 613 N.Y.S.2d 512, 516 (1993)(collateral estoppel would preclude relitigation of issues decided in attorney disciplinary proceeding, in which there was 31 days of testimony, the right to present documentary and testimonial evidence, and full factual review by the Appellate Division).

In the present case, at the hearing before the Commission, which plaintiff put in as part of the record on her cross-motion for summary judgment, Justice Shaw had the opportunity to call witnesses and to cross-examine the witnesses before the Commission. However, there appears to have been no discovery prior to this time. Nor did he have the right to a jury trial. After the three-day hearing, the referee, the Honorable Richard D. Simons, a retired Judge of the New York Court of Appeals, issued a report to the Commission. Pl.Ex. H. Based on this report, and on consideration of the record and the briefing and argument of the parties, the Commission's Determination made the following findings of fact:

—between October 1985 and November 1997, Shaw engaged in "offensive, undignified and harassing conduct" towards plaintiff;

—he "repeatedly made explicit comments to Ms. Bland about the manner in which her clothes fit the various parts of her body";

—he "repeatedly hugged Ms. Bland, rubbed her back and touched her hand without invitation or consent";

—he "repeatedly asked Ms. Bland whether she enjoyed having sex";

—he repeatedly told her that her lips were "wide," "sexy" and "voluptuous";

—in November 1985 Shaw "pulled Ms. Bland into his lap and kissed her on the mouth without her invitation or consent; Ms. Bland jumped up and left the room";

—he repeatedly told Ms. Bland that she had "big tits" and repeatedly made comments about her nipples;

—on May 24, 1996, after Ms. Bland had lost weight, Shaw told her, "If you didn't have large tits, then you would disappear";

—while looking at Ms. Bland's wedding pictures and referring to her breasts, Shaw "remarked that her husband 'would never go hungry' ";

—he "told Ms. Bland that 'from the neck down' she looked 'voluptuous' ";

—in 1997 he "told Ms. Bland that a woman's sole purpose is to make a man feel good in the bedroom";

—early in her tenure, Ms. Bland told Defendant Shaw that she was young enough to be his granddaughter and asked him how he would like it if someone touched his daughter or made her feel uncomfortable;

—Ms. Bland endured Shaw's remarks and touching for twelve years because she was concerned that no one would take her word over that of a judge;

—in November 1997, Ms. Bland told Defendant Shaw that she was tired of his comments and his touching and remarked that he did not make such comments to his male law clerk; and

—on November 24, 1997, plaintiff complained to the EEO Office of the Office of Court Administration and was transferred to another position shortly thereafter.

The record before Judge Simons also included the testimony of Ms. Caroline Rucker, another complaining witness; she claimed to witness some of Justice Shaw's conduct towards Ms. Bland. The Commission concluded that the remarks made by Shaw were "inappropriate and demeaning" and merited "severe sanction." Nonetheless, in light of the fact that Shaw was then 76 years old and would be retiring at the end of the year, it censured him, rather than removed him from the bench. Pl.Ex. I at 4–6.

In December, 1999, Shaw requested review of the censure decision by the Court of Appeals. The Court of Appeals has jurisdiction to review the Judicial Commission's findings of fact and conclusions of law on the record of the proceedings upon which the Commission's determination was based. New York Judiciary Law § 44(9). In addition, Justice Shaw moved before the Commission for reconsideration on the basis of newly discovered evidence. He presented an affidavit from a new witness, Shelley Williams, who averred, based on her conversations with Ms. Rucker, that the charges were fabricated. Williams, a former roommate of Rucker, stated that, prior to testifying before the referee, Rucker told Williams that Rucker and Bland planned to lodge false accusations against Justice Shaw. *See* Affidavit of Shelley Williams dated January 14, 2000, attached as Exhibit A to the Affidavit of James Soffey dated August 3, 2001.

This new evidence was investigated by the Commission. Specifically, the prosecuting attorney examined the new witness,

Ms. Williams, on the record with counsel for Williams present but not counsel for Shaw. Shaw had no opportunity to examine the witness or place evidence on the record during this investigation. A copy of the transcript was furnished to the Commission. As characterized by the Court of Appeals:

> The transcript is filled with repeated admissions, after recesses in which Williams consulted with her attorney, that earlier deposition testimony was false. It includes a bold assertion that Williams was associated with a "hit man" and that Rucker had sought Williams' assistance in arranging for the murder of Rucker's husband and another Judge.

*In re James H. Shaw,* 96 N.Y.2d 7,9, 724 N.Y.S.2d 672, 747 N.E.2d 1272 (2001).

On April 6, 2000 the Commission determined that the new evidence "did not create a reasonable possibility or a probability that [the] Determination would be altered." Pl.Ex. N. Following this decision, the Court of Appeals, by decision dated June 20, 2000, unanimously dismissed the request for review of this decision on the ground that:

> The Court of Appeals does not have jurisdiction to entertain a request for review of such a determination ... the reconsideration determination is non-reviewable ...

Pl.Ex. P.

On review of the underlying decision of the Commission, petitioner again asked the Court of Appeals to remand the case to the Commission, arguing again that Williams's newly discovered exculpatory testimony should be heard first-hand by the referee or the Commission. However, the Court found that such a remittur "is not within the powers conferred on us by the Constitution or the Judiciary Law" (*citing* N.Y. Const. Art VI § 22(d); Judi-

ciary Law § 44(9)), and that these sources, as well as "our precedents lead to the inescapable conclusion that this Court is limited to reviewing the Commission's determination on the record as it was before the Commission at the time of the original determination ... [because] the reconsideration decision is nonreviewable, the additional evidence sought to be introduced on reconsideration cannot now be considered by this Court in its review of the original determination." *In re Shaw,* 96 N.Y.2d 7,12, 724 N.Y.S.2d 672, 675, 747 N.E.2d 1272.

In a separate concurring opinion, Judge Rosenblatt agreed with the Court's conclusions relating to the jurisdictional constrictions on the powers of the Court, but wrote in addition to "express my concern with a process in which newly discovered allegations of perjury were never heard firsthand by a neutral arbiter." As analyzed by Judge Rosenblatt:

> The Commission's original censure determination was based entirely on the testimony of Jacqueline Bland and Caroline Rucker, each of whom alleged that Justice Shaw engaged in sexual harassment. While review of the censure determination was pending before us, Shelly Williams told Justice Shaw that Rucker admitted to having fabricated the charges along with Bland.

> \* \* \* \* \* \*

> Based on Williams' affidavit, Justice Shaw moved the Commission for reconsideration. As part of his motion he requested that a neutral party (the Referee or the Commission itself) conduct a hearing to evaluate Williams' testimony firsthand before rendering a decision. With no one except Williams' attorney present, Commission Counsel—the prosecutorial arm of the commission—interviewed Williams on the record. He

compellingly impeached Williams' credibility as to various collateral matters. He did not, however, disprove her central allegation—that Justice Shaw had been framed and that the testimony against him was perjured[.]

\* \* \* \* \* \*

[Based on this transcript and an affidavit from Rucker] the Commission denied Justice Shaw's request for a hearing (and for reconsideration generally) holding that the Williams evidence did not create a reasonable *possibility or a probability* [emphasis in original] that [the] determination would be altered. The Commission thus mingled two wholly distinct evidentiary criteria—"possibility" and "probability." [footnote omitted] Consequently, Williams was never produced before the Commission or the Referee. In the end, Justice Shaw received less consideration than is normally accorded parties in criminal or civil cases who come in with newly discovered evidence. [The opinion went on to compare these procedures with those afforded by the New York CPL 440.34(c) and (d) and CPLR 5015(a)(2) to criminal and civil litigants.]

Williams might well have been lying. Based on the parties' submission to the Commission, however, I cannot rule out the reasonable possibility that she was telling the truth as to the alleged frameup. The gravity of her allegations called for direct inquiry by a neutral arbiter . . .

\* \* \* \* \* \*

The Commission is of course entitled to create its own standard in dealing with newly discovered evidence. Here, however, it formulated one that is impracticable as a result and the Williams evidence was never adequately considered.

96 N.Y.2d at 15–16, 724 N.Y.S.2d at 677, 747 N.E.2d 1272.

I agree with Judge Rosenblatt. The lack of any ability to present the new evidence in any manner other than by cross-examination by the prosecuting counsel, the lack of right to appeal in any form of the Commission's decision to disregard such evidence, as well as the fact that Justice Shaw did not seek the administrative forum, raise serious questions as to whether Shaw had a full and fair opportunity to litigate the factual questions that could support his civil liability in the present case. Moreover, this consideration aside, the Appellate Division decisions in *Stevenson* and *Jeffreys* cast doubt on whether the Commission's findings would be given preclusive effect in New York.

Even if the Commission's factual findings were entitled to preclusive effect here, the Commission's findings would not necessarily entitle plaintiff to judgment here because they do not necessarily "prove or disprove, without more, an essential element of any of the claims set forth in the complaint." *Curry v. City of Syracuse*, 316 F.3d 324, 333. As set out above, only those issues that were necessary to the determination in the prior action have preclusive effect on a later proceeding. *Menna v. Joy*, 86 A.D.2d 138, 141, 449 N.Y.S.2d 48, 49; *Wilder v. Thomas*, 854 F.2d 605, 620.

 Under a "hostile work environment" theory, plaintiff must establish that, in the context of her relationship with her employer, the "workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment . . ." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (citation and internal quotation omitted). Ultimately this element of plaintiff's cause of action turns on how Justice Shaw's conduct affected plaintiff's subjec-

tive perception of her environment. "If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, there is no Title VII violation." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

The Commission's determination that Justice Shaw's behavior was in and of itself "inappropriate and demeaning" and merited "severe sanction" does not resolve this issue. Nor do the underlying findings of fact that were necessary to support these conclusions. In this case, in which the conduct attributed by plaintiff to Justice Shaw continued from the date of her employment for almost twelve years before she registered a complaint, the question remains one "especially well-suited for jury determination." *Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426, 437.

In sum, the problem with the findings of the Commission for the purposes of collateral estoppel are three-fold. Under New York law, it is arguable whether they would be entitled to preclusive effect. Moreover, Justice Shaw lacked a full and fair opportunity to litigate sufficient to deprive him of his Seventh Amendment right to a trial by jury of the complaint against him here. Finally, an essential element of the hostile work environment claim was not "necessarily decided" by the Commission.

### Conclusion

The claims under 42 U.S.C. §§ 1983 and 1981 and New York State and City law are dismissed under the Eleventh Amendment against all parties except Justice Shaw. The Title VII claim is dismissed as against all parties because plaintiff is not an "employee" for the purpose of Title VII. The retaliation claim does not survive dismissal because it does not state a claim under § 1983. The racial discrimination claim (under §§ 1981 and 1983) remains potentially viable as to Justice Shaw, and the motion to dismiss is denied. The motion to dismiss the State and City Human Rights claims as to Shaw are denied. The motion to dismiss the § 1983 claim and State and City law claims on statute of limitations grounds is denied. Plaintiff's cross-motion for judgment under principles of collateral estoppel is denied.

**SO ORDERED.**